IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PELOTON INTERACTIVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 19-1903 (RGA) |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| ECHELON FITNESS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED COMPLAINT FOR PATENT INFRINGEMENT,
TRADEMARK INFRINGEMENT, TRADE DRESS INFRINGEMENT,
TRADEMARK AND TRADE DRESS DILUTION, TRADE LIBEL,
FALSE ADVERTISING, AND UNFAIR BUSINESS PRACTICES**

Plaintiff Peloton Interactive, Inc. ("Peloton"), through its attorneys at Hueston Hennigan LLP and Morris, Nichols, Arsht & Tunnell LLP, hereby brings this action against Echelon Fitness, LLC ("Echelon"), and alleges as follows:

**SUMMARY OF THE ACTION**

1.      Since its inception in 2012, Peloton has disrupted the fitness industry, becoming the largest interactive fitness platform in the world with a loyal community of over 1.4 million members.  Peloton has delivered more than 400,000 Peloton bikes ("Peloton Bike"), and, in fiscal year 2019 alone, its members completed over 58 million Peloton workouts.  The Peloton Bike has received near-universal adulation, with *Men's Health* naming it "the best cardio machine on the planet."  Peloton now employs more than 1,900 people across the country and earned more than $900 million in revenue in fiscal year 2019.

2.      The Peloton Bike is the first ever at-home exercise bike that incorporates a sophisticated graphical user interface—presented on a 22-inch HD, multitouch tablet—that

displays live and on-demand cycling classes led by some of the world's most elite instructors. The Peloton Bike uses sensors to measure the rider's performance and can display a leaderboard comparing the rider's performance at each point in the class with the performance of every other rider that is currently taking—or has ever taken—the same class.  This "Leaderboard" utilizes Peloton's patented technology to show Peloton riders how their performance ranks in comparison to all other riders that have taken that same class, past and present, at every point in the class.

3.      Peloton's inventions solved two major problems for would-be exercisers.  First, they removed a significant constraint of in-studio cycling classes, which are offered only at fixed locations and times, by allowing riders the flexibility to access cycling classes—in their own home and on their own schedule.  Second, they solved a problem faced by previous at-home stationary bikes—rider boredom due to lack of variety and engagement—by providing live and on-demand classes with an improved and more efficient graphical user interface that not only recreates, but enhances, the real-time competition and community engagement that has made in-studio classes so popular.

4.      To protect these and other innovations in the Peloton Bike, Foley and Peloton applied for, and received, multiple patents, including U.S. Patent No. 10,022,590 ("the '590 Patent), U.S. Patent No. 10,322,315 ("the '315 Patent), and U.S. Patent No. 10,486,026 ("the '026 Patent"), which are at issue in this lawsuit (together, the "Peloton Patents").

5.      With Peloton's hard-fought success, competitors, including Defendant Echelon, have attempted to free ride off Peloton's innovative technology.  Rather than develop new technology, Echelon chose to simply appropriate Peloton's intellectual property and flood the market with cheap, copycat products.  Echelon similarly chose to copy Peloton's federally

registered trademark and the Peloton Bike's distinctive trade dress, including but not limited to Peloton's distinctive logo, coloring, and font.  Unsurprisingly, the market has taken notice: on August 28, 2019, *The New York Times* published an article calling Echelon's products "***a blatant knockoff***" of Peloton's, right "down to a round black logo."

6.      With at least its Smart Connect EX1, EX3, EX5, and EX5s bikes, Echelon specifically infringes the Peloton Patents by, among other things, displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that remote rider's performance against the performance of other remote riders.  Echelon also infringes the Peloton Patents by imitating the Peloton Bike experience through the "Echelon Fit App" which, among other things, detects, synchronizes, and compares the ride metrics of remote users on a graphical user interface.

7.      Echelon has also unlawfully engaged in a false advertising campaign in an effort to further undercut Peloton's business.  For example, Echelon has disseminated advertisements that mislead customers by claiming Peloton's "Bike Price" is $2,245, while Echelon's "Bike Price" is $999.  In truth, Peloton's "Bike Price" includes the actual bike ***and*** a 22-inch high-definition touchscreen display, while Echelon's "Bike Price" includes only the actual bike—to use their service, Echelon customers are forced to purchase their own display device at a cost of hundreds of additional dollars.  Echelon misleads customers by comparing deceptive price points.  In fact, the Echelon product that does include a touchscreen and is thus the proper comparator sells for $1,639.98, not $999.  And even that $1,639.98 price point does not include shipping or assembly.  Echelon's standard shipping and assembly costs $399.98, meaning that the accurate comparator price of an Echelon bike is $2039.96 – just $200 less than the $2,245 price of a Peloton bike, which includes both delivery and setup.  Echelon is thus misleading

customers with deceptive comparisons and continues to sell the bikes widely promoted in these false and misleading advertisements.

8.  Echelon also misrepresents to consumers that Peloton's workouts are limited to "'After The Ride' + Cross Training Workouts" while Echelon purportedly provides "'FitPass' featuring trainer-led yoga, stretching, pre-and-post workout sessions, meditations, pilates, kickboxing, Zumba and more."  In fact, Peloton workouts also include instructor-led yoga, stretching, pre- and post-workout content, meditation, bootcamp, indoor and outdoor running and walking, and more—far more than Echelon offers.  Echelon also falsely tells consumers that Peloton has only 12 instructors while Echelon has over 30 trainers—Peloton actually has 29, while Echelon has only 17 trainers featured on its website.

9.  Through its false advertising campaign, Echelon has engaged in unfair competition by, among other things, misleading customers about the price of the parties' products, misrepresenting the breadth of Peloton's workouts, and deflating the number of instructors Peloton has while inflating the Echelon offering.  As a result, Echelon has unfairly stolen customers from Peloton and attracted funding from investors that has reportedly brought Echelon's total valuation to over $100 million.

10.  Peloton brings this suit to protect its rights and put an end to Echelon's patent infringement, trademark infringement, trade dress infringement, trademark and trade dress dilution, trade libel, false advertising, and deceptive business practices.

**THE PARTIES**

11.  Peloton is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 125 West 25th Street, 11th Floor, New York, New York, 10001.

12.     Echelon is a corporation organized and existing under the laws of the State of Delaware.  On information and belief, Echelon's principal place of business is at 1400 Market Street, Chattanooga, Tennessee, 37402.

## JURISDICTION AND VENUE

13.     Certain claims in this civil action arise under the patent laws of the United States, 35 U.S.C. § 1 et seq.  This Court has subject matter jurisdiction over the patent claims pursuant to 28 U.S.C. §§ 1331 and 1338.  Certain claims in this civil action also arise under the Lanham Act, 15 U.S.C. § 1125.  This Court has subject matter jurisdiction over the Lanham Act claims pursuant to 15 U.S.C. § 1121 and under 28 U.S.C. §§ 1331 and 1338.  Subject matter jurisdiction over related state and common law claims is proper pursuant to 28 U.S.C. §§ 1338 and 1367. The state law claims are integrally interrelated with Peloton's federal claims and arise from a common nucleus of operative facts such that the administration of the state law claims with the federal claims furthers the interest of judicial economy.

14.     This Court has personal jurisdiction over Echelon pursuant to the laws of the State of Delaware and the United States Constitution because Echelon is a Delaware corporation. Echelon also regularly and continuously transacts business in the jurisdiction, including marketing and selling Echelon services and products throughout the State of Delaware.  Echelon places infringing products within the stream of commerce, which stream is directed at the State of Delaware, with knowledge and/or understanding that those products will be sold in the State of Delaware.  Echelon has also disseminated false and misleading information in the State of Delaware about both the Echelon and Peloton products and services as part of its marketing campaign.

15.     Echelon has infringed or caused infringement in the State of Delaware by, among other things, promoting, offering for sale, and selling the infringing Echelon Bikes in the District. Echelon also provides services and assembles products that are and have been used, offered for sale, sold, and purchased in the State of Delaware.  Therefore, the exercise of jurisdiction over Echelon is appropriate under the applicable jurisdictional statutes and would not offend traditional notions of fair play and substantial justice.

16.     Venue is proper for claims in this district under 28 U.S.C. §§ 1391(b) & (c) and 1400(b) because Echelon is incorporated in the State of Delaware and has committed, and continues to commit, acts of patent infringement, unfair competition and false advertising, trademark infringement, trade dress infringement, trademark and trade dress dilution, trade libel, and deceptive trade practices within the State of Delaware.

## FACTUAL ALLEGATIONS

### I.   Disrupting the Fitness Category

17.     Since being founded in early 2012, Peloton has revolutionized the fitness industry with its category-creating at-home cycling bike, the Peloton Bike.  Unlike the at-home bikes that came before it, the Peloton Bike is a sleek, technologically advanced system that combines a first-in-class exercise bike with state-of-the-art technology that allows riders to experience live and on-demand cycling classes—led by some of the world's best instructors—from the comfort of their own homes.

18.     Featuring a 22-inch high-definition, sweat resistant, multitouch tablet, the Peloton Bike measures and displays a rider's performance metrics and presents those metrics for live or time-synced comparison with other Peloton riders.  This new technology allows Peloton riders to see where their performance stands against all other riders on a leaderboard throughout the

cycling class, re-creating the energetic and competitive in-studio cycling experience at home on their own schedule.

19.     In fact, not only does Peloton recreate the in-studio experience, it improves it.  A rider taking a regular in-studio class may see his or her performance compared only against the other riders in the same class at the same time. The same rider taking a class on a Peloton Bike can see her performance compared, at every point in the class, against hundreds (for a live class) or even thousands (for an on-demand class) of other riders from around the world, regardless of when they took the class.  In addition, the Peloton Bike allows its riders to interact with other remote riders during a class, for example by giving a virtual "high five" to another rider, encouraging a friend via live video chat, or saving a song heard in class to their favorite streaming service.  These features are not available or useful for in-studio-only cycling classes.



*Above: The Peloton Bike*



*Above: The Peloton Graphical User Interface and Leaderboard*



*Above: The Peloton Graphical User Interface, Leaderboard, and Live Video Chat*

20.     Peloton's success has been remarkable.  *Men's Health* has called the Peloton Bike "the best cardio machine on the planet."  *USA Today* has said it is "attractive, addictive, and seriously whips you into shape."  And in a comparison of numerous at-home bikes, *The Wall Street Journal* concluded that "the best bike, by far, was [the] Peloton."  The Peloton Bike also received the award for the Best Health and Fitness Device at the Consumer Electronics Show in 2018.

21.     The Peloton Bike retails for $2,245 (which includes the $250 delivery and set-up fee), and owners pay $39 per month for a subscription to Peloton's exclusive live and on-demand cycling classes as well as other exercise content.

22.     To date, Peloton has delivered more than 400,000 Peloton Bikes, building its member base from zero to over 1.4 million in seven years.  Its revenue has been growing rapidly as a result.  For example, in fiscal year 2017, Peloton's revenue shot to over $200 million, and in fiscal year 2018, doubled to over $400 million.  In fiscal year 2019, its revenue more than doubled again to approximately $900 million.  Peloton has also won countless awards, including being named one of the World's Most Innovative Companies by *Fast Company* in 2016, 2017, and 2018.

## II.     The Journey to Inventing the Peloton Bike

23.     When Peloton was founded, fitness studios that provided studio cycling classes were becoming tremendously popular.  SoulCycle and Flywheel had multiple studios and were growing quickly.  While in-studio classes provide a great consumer experience, they start at predetermined times, have limited space per class, and require travel from one's home or office to the gym or studio.  As a result, in-studio classes can be hard to attend for people with busy

work schedules and families at home. Peloton founder and CEO John Foley was one of those people.

24.     After realizing that countless others undoubtedly faced the same challenge, Foley began a journey that would see him and his co-founders invent a new category of fitness equipment that provides the immersive, fun and competitive in-studio cycling class experience, at home, at any time.

25.     Having majored in industrial engineering at Georgia Tech and studied business at Harvard Business School, Foley then worked in e-commerce and the tech industry for over a decade.  This gave him a sophisticated understanding of the intersection of business and technology.  However, Foley also realized that this project would require a team of smart, savvy leaders in different fields to bring it to consumers, and he therefore started recruiting other tech leaders who shared his vision.

26.     Foley approached his friend and former colleague, Tom Cortese.  Over dinner one night in 2011, Foley told Cortese that he believed there was a large, untapped market available if they could just figure out how to allow cycling fans to access the best instructors and have the same in-studio cycling class experience at any time, no matter where they live and no matter how busy their schedules are.  Cortese joined and has been with Peloton ever since, currently serving as Peloton's Chief Operating Officer.

27.     Foley also recruited three others, whom he asked to join as co-founders of Peloton: technological guru Yony Feng, to help design and build a prototype Peloton Bike; accomplished lawyer Hisao Kushi, to guide Peloton through the legal and regulatory framework facing the new start-up; and internet executive Graham Stanton, to help guide the company through its early years and to manage the company's finances and growth strategy.  All accepted,

and all three remain with the company to this day.  Feng is Peloton's Chief Technology Officer; Kushi is Chief Legal Officer; and Stanton is Senior Vice President, Business Intelligence.

28.     With a strong team in place, Foley was able to raise an initial seed investment of $350,000, along with $50,000 of Foley's own savings. This allowed the young start-up to rent a small office in New York City from which it could develop and create the first prototype of the Peloton Bike.

29.     To create the product that Foley and his co-founders envisioned, Peloton developed (1) a visually appealing, sturdy, and technologically advanced exercise bike; (2) a large, sweatproof, wi-fi enabled, high-definition touchscreen tablet computer; (3) an attractive graphical user interface and related software and backend systems to integrate the bike and tablet and track, synchronize, and dynamically display metrics; and (4) first-in-class cycling class content and the systems to deliver that content.  All equipment needed to be durable, lasting for years with minimal maintenance.

30.     Start-ups will often partner with existing companies and products to custom build as little as possible.  Building one's own hardware and software from the ground up, by contrast, is expensive, time-consuming, and fraught with obstacles, known and unknown.  However, Peloton quickly discovered that no existing exercise bike had all the required characteristics: sturdiness, durability, visual appeal, efficiency, and technological capability.  Nor was there any touchscreen tablet available on the market at the time that would suit its needs.  In addition, Peloton realized that no existing products could communicate with the bike hardware, or track and analyze rider performance in the way they envisioned.  In short, the Peloton team quickly realized that it would need to create virtually the entire Peloton Bike from scratch, including the bike and tablet.

31.     What's more, to effectuate its vision of immersive studio cycling at home, Peloton also needed to figure out how to integrate the hardware (the bike and tablet) with its own software so that the software could communicate with the bike to track performance metrics, store those metrics, communicate those metrics back to the rider, and transfer those metrics to a server so that they could be synchronized and compared with other riders' metrics.

32.     The technological challenges and unknowns faced by the Peloton team also created a significant financial hurdle.  Investors viewed Peloton's plan to build its own hardware and software as too costly and difficult and were not convinced there was a viable market for the product.  Dozens of investors declined the opportunity to invest in Peloton because they were not willing to take the risk of investing up front in such a new and challenging endeavor.

33.     Yet through research, ingenuity, and persistence, Peloton pushed on, working with partners to design and produce the necessary high-tech, sleek bikes and tablets.  To build the first prototype, Feng, the Chief Technology Officer then and now, created a proof-of-concept apparatus using a standard off-the-shelf stationary bike, then attaching sensors with a stripped-down electronics board running the Android-based app that he developed and a computer monitor rigged to the bike's front.  As reflected in the images below, Feng went through a long, iterative process to develop a successful hardware-software integration.

*The Peloton Bike's software and tablet evolution:*



*The early version of the Peloton Bike, left, compared with the version at launch, right:*




*Testing the software with an early version of Peloton Bike:*

 

34.     This unique hardware-software integration would be the basis for Peloton's prototype.  By the end of 2012, after a year of hard work, investment, and development, Peloton finally had a prototype in hand to show investors.

35.     But even after the Peloton Bike prototype was created, Peloton struggled to raise money.  Foley was rejected by countless investment firms and was repeatedly told that the Peloton Bike simply was not viable.

36.     Yet, despite these repeated rejections, Foley persisted—continuing to take risks, making significant personal investments, and dedicating more time to developing the best possible product.  He did so because of his belief that at-home fitness equipment simply had not evolved at the same pace that group exercise classes had.  He continued to pitch potential investors until, many rejections later, he found a group of investors who believed in Peloton and invested the first $10 million that helped launch the Peloton Bike on a commercial scale.

### III.   <u>Bringing Peloton to Market</u>

37.     After extensive troubleshooting and tinkering on the early prototype bikes, Peloton was ready to take the important step of manufacturing the bike and selling it to its first customers.  Peloton held a Kickstarter campaign with the goal of raising enough capital to start

manufacturing the bike.  As Peloton explained, "[t]his involves building the 'tools' required to create each unique part (yes, we first have to build the machinery that will build the bike!) and pre-purchasing lots of steel, aluminum, plastic, microchips (there are 17 in our console alone)." The Kickstarter campaign raised more than $300,000 and generated initial orders for 188 bikes.

38.     Sales were initially slow—188 bikes was far from Peloton's target, and far from the demand Foley knew existed.  Peloton was a new product, and people were wary of the product and how useful it would be.  Like every other phase of their journey, Peloton was not going to become successful overnight—they were going to have to work for it. With intensive and creative marketing efforts, including pop-up stores in choice locations, and as word of mouth spread, sales began to pick up.

39.     In January 2014, two years after Peloton was founded, the first bikes were delivered to customers.

40.     By now, Peloton has designed in-house almost everything that other companies outsource to third parties: hardware, software, content, and logistics.  As an Inc.com article reported, "Peloton has defied every aspect of the prevailing startup ethos of doing it fast and lean, buying off the shelf, partnering and, above all, custom-building as little as possible."  It likewise described that Foley and his team have "[broken] every rule" to make Peloton a reality.

41.     It is a reality that continues to grow and exceed expectations.  In its latest investment round, Peloton raised $550 million at a valuation of $4.15 billion; and on September 26, 2019, Peloton debuted on the NASDAQ stock exchange as a publicly traded company. Peloton continues to expand both nationally and internationally.  Most importantly, Peloton is doing what it set out to do—allowing more people than ever to participate in high-energy, state-

of-the-art exercise on their own schedule, and empowering members to maximize their most valuable resource: time.

## IV.     Peloton Patents Its Intellectual Property

42.     After years of investment, risk, and innovation, Peloton has become a leader of the at-home fitness world.  To protect its intellectual property, Foley and the Peloton inventor team have applied for, and received, patents covering their inventions.

43.     United States Patent No. 10,022,590 titled *Exercise System and Method*, was duly and lawfully issued on July 17, 2018.  A true and correct copy of the '590 Patent is attached hereto as Exhibit 1.

44.     United States Patent No. 10,322,315 titled *Exercise System and Method*, was duly and lawfully issued on June 18, 2019.  A true and correct copy of the '315 Patent is attached hereto as Exhibit 2.

45.     United States Patent No. 10,486,026 titled *Exercise System and Method*, was duly and lawfully issued on November 26, 2019.  A true and correct copy of the '026 Patent is attached hereto as Exhibit 3.

46.     Plaintiff Peloton Interactive, Inc. is the current owner of all rights, title, and interest in and to the Peloton Patents.  Peloton and the Peloton Bike practice the '590 and '315 Patents because, among other things, the Peloton Bike has a plurality of sensors operable to detect activity by a first user and generate first user performance parameters; the Peloton Bike further includes a local processing system that is operable to: (1) display live and archived cycling classes, (2) track the first user performance parameters at a particular point in a selected cycling class, and (3) display at least one first user performance parameter and at least one of a plurality of second user performance parameters received via a digital communication network

16

from a second local processing system at a second location such that at least one of the first user performance parameters at the particular point in the selected cycling class and at least one of the second user performance parameters at the same point in the selected cycling class are presented for comparison on a display screen.   Peloton thus manufactures and sells a commercial embodiment of the Peloton Patents, including the Peloton Bike with a subscription to Peloton classes.

47.     Peloton and the Peloton Bike also practice the '026 Patent because, among other things, they provide an exercise system for computer-augmented use at home by a user participating in archived exercise classes accessible over a computer network. The Peloton Bike comprises sensors operable to generate first user performance data based on a first user's activity. The Peloton Bike further comprises a computer configured to: cause a display screen to present a plurality of available archived exercise classes; accept from the first user, via a user input interface, a selection of one of the available archived exercise classes; receive, via a computer network, data representing content of the selected archived class; and cause the display screen to display the content of the selected archived exercise class while the first user participates in that class. The Peloton Bike's computer can also receive, via a sensor input interface, the first user performance data from the sensors during the selected archived exercise class, and generates, on the basis of that first user performance data, first user performance parameters. The computer also receives, via the computer network, archived performance data representing archived user performance parameters for a plurality of other users over at least a portion of the selected archived class.   The computer further synchronizes this archived performance data with the first user performance data, such that archived user performance parameters are synchronized with the first user performance parameters; the computer further

causes the display screen to display a dynamically updating ranked list of a first user performance parameter and at least some of the archived user performance parameters, to thereby simulate the first user competing with at least some of the other users. Peloton thus manufactures and sells a commercial embodiment of the '026 Patent, including the Peloton Bike with a subscription to Peloton classes.

## V.   The Peloton Patents Recite Inventive Concepts That Were Not Well Understood, Routine, Or Conventional At The Time

### A.   The '590 and '315 Patents

48.     As described herein, the Peloton Bike is a revolutionary, category-creating device that: (1) solved significant problems in the prior art; (2) has experienced immense market success; (3) has received near-universal market praise; (4) overcame significant technological hurdles in development; and (5) overcame initial market reservations about its viability.   The Peloton Bike implemented inventive concepts that were not well-understood, routine, or conventional at the time it was developed.   These inventive concepts are incorporated into the claims of the Peloton Patents.   It is the inventive concepts contained in the claims of the Peloton Patents that account for the Peloton Bike's leaps-and-bounds improvement over the prior art, as well as its resulting economic success.

49.     For example, Claim 1 of the '590 Patent describes a system with a user interface operable to "display live and archived cycling class content to a first user at a first location." Similarly, Claims 1 and 11 of the '315 Patent describe a method comprising displaying or providing "information about live and archived exercise classes that can be accessed by a first user via a digital communication network on a display screen at a first location."   These claim limitations alone describe an unconventional improvement over the prior art.

50.     Prior art cycling classes only allowed users to participate in live classes; they did not offer any capability for a user to access and participate in archived cycling classes.  With respect to home bikes, on the other hand, it was not well-understood, routine, or conventional to provide a home bike with networked access to a live cycling class.  Nor was it well-understood, routine, or conventional to provide a home bike with *both*: (1) networked access to live cycling classes; *and* (2) networked access to archived cycling classes.

51.     According to Claim 1 of both the '590 and the '315 Patents, and Claim 11 of the '315 Patent, a user can select from one of the available live and archived cycling classes and receive that selection output to the user's display screen.  This functionality is what allowed one of the significant advances over the prior art, as described elsewhere in this Complaint.  It is this functionality that allows a user to exercise in the most competitive, interactive way possible, while also balancing the user's need for flexible scheduling of his or her workouts.

52.     With access to *either* live *or* archived classes, the user can, at his or her own discretion, decide whether it is more important to that user, on a given day, to start a workout at the instant he or she wants (in which case the user will select an archived class), or whether it is more important to the user's motivation to exercise to be able to participate live with other class participants (in which case the user will select a live class).  Offering this flexibility was a major advancement over both live classes and at-home bikes in existence at that time.

53.     Claim 1 of the '590 Patent also describes tracking performance parameters for the user, as well as performance parameters for a second, remote user, and presenting "at least one of [the] first user performance parameters at the particular point in the selected cycling class and at least one of the second user performance parameters at the same point in the selected class . . . for comparison on the display screen at the first location."  Claims 1 and 11 of the '315 Patent

have a similar limitation.  These limitations, which apply whether a user has selected a live or an archived class, describe an inventive way to give a user, cycling in his or her own home, access to a motivating feeling of competition with another rider.

54.     For a live class, as described in Claim 1 of both the '590 and '315 Patents, and Claim 11 of the '315 Patent, the user's performance parameters are presented on the user's screen along with at least one performance parameter of another remote user taking the class at the same time, wherever he or she may be.  This functionality—which gives the user the ability to compete in a live class with another user participating in that same class from anywhere around the globe—was not well-understood, routine, or conventional at the time of the invention of the Peloton Patents, and helped solve the "rider boredom" problem set forth elsewhere in this Complaint.

55.     For an archived class, as described in both Claims 1 of the '590 and '315 Patents, and Claim 11 of the '315 Patent, at least one performance parameter of another user who has taken the class previously is time-shifted so that it is presented to the user, together with at least one of the user's own performance parameters, for comparison "at the same point in the selected cycling class."  This functionality—which gives the user the ability to compete in real-time with another user who participated in that class previously, no matter where or when that other user participated—was revolutionary at the time, and *also* helped solve the "rider boredom" problem. In this way, the system and method described in both Claims 1 of the '590 and '315 Patents offered *multiple inventive ways* for a user to be motivated to exercise by competition with a remote user, and was thus an immense improvement over the prior art.

56.     The dependent claims of the Peloton Patents add additional inventive concepts to the independent claims that offer further unconventional improvements over the prior art, both

alone and in combination, and result in increased motivation and engagement for riders.  For example, Claim 15 of the '590 Patent adds the concept of "generating a leaderboard from the class participant content and the plurality of first user parameters, the leaderboard representing performance parameters at the same point in the selected cycling class; and displaying the leaderboard on the display screen at the first location."  Claims 6 and 16 of the '315 Patent are similar.  Again, this claim language applies whether the user has selected a live or an archived class.  And the idea of having a system that could perform this leaderboard functionality for both a live and an archived class was revolutionary.

57.     As another example, Claim 16 of the '590 Patent and Claims 7 and 17 of the '315 Patent claim "class participant content" that "comprises live and archived class participant content."  These claims add to the underlying claims the additional inventive concept that live *and* archived content would appear *on the same leaderboard*.  No other cycling system was doing this at the time of the invention of the Peloton Patents.

58.     As yet another example, Claim 17 of the '590 Patent, and Claims 7 and 17 of the '315 Patent, further describe the time-synchronization aspect of the Peloton Patents, and Claim 18 of the '590 Patent, and Claims 8 and 18 of the '315 Patent, describe how that aspect can be implemented: by ensuring that the class participant content "comprises a start signal indicating a starting point of the cycling class," and that the "class participant content is synchronized to the start signal for data comparison."  Once more, these concepts were not well-understood, routine, or conventional at the time of invention of the Peloton Patents.

59.     Finally, several of the claims of the Peloton Patents describe particular types of information to be displayed on the user interface, and particular ways in which that information should be displayed.  *See* '590 Patent, Claims 6-8, 12-13, 20; '315 Patent, Claims 3, 10, 13, 20.

These concepts, as well, were not well-understood, routine, or conventional at the time of invention of the Peloton Patents.

60.     Far from an abstract idea, the claims of the '590 and '315 Patents are also directed to a tangible system, or a method of using such a system, with an observable real-world impact. Indeed, the '590 and '315 Patent claim physical and concrete devices that carry forward the inventive concepts described above. For example, both Claims 1 of the '590 and '315 Patents incorporate an improved user interface that includes a "display screen" to present the live and archived cycling classes, cycling class content, performance parameters, and time-shifted leaderboard.  As another example, Claim 1 of the '590 Patent further incorporate "sensors" that are operable to detect activity and generate the previously described performance parameters. As another example, the dependent claims of the '590 Patent specifically disclose the use of a "stationary cycle" and a "resistance adjustment apparatus." *See, e.g.*, '590 Patent Claims 2-4. These physical devices create an improved tangible exercise system, such as a stationary at-home bike.

### B.    The '026 Patent

61.     The '026 Patent also describes and claims concepts that were not well-understood, routine, or conventional at the time of the '026 Patent by claiming an exercise system and focusing on the "archived class" aspects of the invention claimed in the '590 and '315 Patents. For example, Claim 1 of the '026 Patent describes "an exercise system for computer-augmented use at home by a first user participating in an archived exercise class accessible over a computer network" comprising, among other things, a computer configured to "cause the display screen to display the content of the selected archived exercise class" while a user participates in that class. As described above, this alone describes an unconventional improvement over the prior art,

because prior art in-studio classes did not offer any capability for a user to access and participate in archived exercise classes. And it was not well-understood, routine, or conventional to provide a home bike with networked access to an archived exercise class. By providing remote users with networked access to archived cycling classes, the '026 Patent allowed remote riders to have the experience of an in-studio cycling class, in the comfort of their own home and on whatever schedule they chose. This offering was a major advancement over both live in-studio classes and at-home bikes in existence at that time.

62.     Claim 1 also describes "a sensor operable to generate first user performance data based on activity by the first user," "receiv[ing], via a sensor input interface, the first user performance data from the sensor," "generat[ing], on a basis of the first user performance data, a first user performance parameter," "receiv[ing] archived performance data" from other users, "synchroniz[ing] the archived performance data with the first user performance data," and "display[ing] a dynamically updated ranked list of the first user performance parameter and at least some of the synchronized archived user performance parameters, to thereby simulate the first user competing with at least some of the other users." This functionality, which allowed a remote user taking an archived class to experience the feeling of "live" competition with hundreds, or even thousands, of previous riders, was revolutionary at the time, and critical to solving the "rider boredom" problem described in this Complaint. No prior art system allowed a user to do that, whether at home or in-studio.

63.     Independent Claim 11 of the '026 Patent recites unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent Claim 1.

64.     The dependent claims of the '026 Patent add additional inventive concepts to what is recited in independent Claims 1 and 11 and offer further unconventional improvements over the prior art, both alone and in combination, and result in increased motivation and engagement for riders. For example, Claim 7 recites a system "wherein the computer is further configured to receive the content of the selected archived exercise class and class participant content associated with the selected archived exercise class from a remote server via the computer network, and wherein the content of the selected archived exercise class and/or class participant content includes live content generated in realtime." This claim adds to the underlying claims the additional inventive concept of allowing content of an archived class, or class participant content to include live content. As an example, this functionality can permit two people in different locations to take an archived class at the same time and to compete against each other in real time, with their respective performance parameters being displayed to each other. Having a system with this capability is a major advancement over both in-studio classes and existing in-home bikes, and is far from "well-understood, routine, or conventional." Claim 18 recites similar functionality and was likewise unconventional.

65.     As another example, Claim 8 adds the concept of "generat[ing] a leaderboard from the archived performance data and the first user performance parameter, the leaderboard representing performance parameters at the same point in the selected archived exercise class." Having a system that could perform this leaderboard functionality for an archived class was revolutionary. Dependent Claim 13 recites essentially this same functionality and was also unconventional.

66.     Other claims of the '026 Patent describe particular types of information to be displayed on the user interface, and the particular ways in which that information should be

displayed. See Claims 2, 3, 5, 12 and 20. These concepts, as well, were not well-understood, routine, or conventional at the time of the invention of the '026 Patent.

67.     Far from an abstract idea, the claims of the '026 Patent are also directed to a tangible system with an observable real-world impact.  Indeed, the '026 Patent claims physical and concrete devices that carry forward the inventive concepts described above. For example, Claim 1 incorporates "an exercise device" and "sensor" to generate the previously described performance data. As another example, Claim 1 further incorporates a "display screen" to present the archived exercise classes, class content, performance data, and time-shifted leaderboard. Dependent Claim 10, as another example, specifically discloses the use of a "stationary cycle."  These physical devices create an improved tangible exercise system, such as a stationary at-home bike.

## VI.   Echelon Infringes With Its Copycat Products

68.     Because of Peloton's success, competitors have brought copycat products to market that infringe Peloton's intellectual property.  In February 2018, Echelon announced its intent to launch a product similar to the Peloton Bike, called the Connect bike.  The Connect bike was the precursor to the Smart Connect EX1, EX3, EX5, and EX5s bikes (the "Echelon Bikes"), which Echelon sells as of the filing of this Complaint.

69.     With the Echelon Bikes, Echelon infringes the Peloton Patents by, among other things, displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that remote rider's performance against the performance of other remote riders.  Echelon markets the Echelon Bikes by informing riders that they can "JOIN US FOR LIVE STUDIO FITNESS FROM THE COMFORT OF HOME."  Echelon further

advertises its "New On Demand content added daily so you can work out where you want, when you want."

**LIVE, ON DEMAND, AND SCENIC RIDES WITH THE ECHELON FIT APP**

 **LIVE RIDES**
High energy live classes with certified cycle instructors, keep you motivated from our studio in Chattanooga, Tennessee.

 **RIDE ON YOUR TIME**
New On Demand content added daily so you can work out where you want, when you want.

 **RIDE ANYWHERE**
Take a trip without leaving the comfort of your own home. Scenic rides through the French countryside to the streets of Singapore help you unwind and feel the burn at your own pace.







*Above: Images of the Echelon Bikes and its copycat leaderboard.*

70.     As of the filing of this Complaint, Echelon makes, uses, sells, and offers for sale the Echelon Bikes, which infringe the Peloton Patents.  The Echelon Bikes, like the Peloton Bike, allow riders to access live and archived cycling classes from the comfort of home, including tracking, synchronizing, and comparing performance metrics of the at-home rider and other riders.

71.     Echelon actively markets and sells the Echelon Bikes to customers across the United States, including in the District of Delaware.

72.     The Echelon Bikes are also available for purchase on Echelon's website.  Echelon offers to ship the Echelon Bikes to any location in the continental United States and elsewhere, including the United Kingdom, Canada, and Mexico.

73.     Echelon and the Echelon Bikes satisfy each and every limitation of one or more claims of the '590, '315, and '026 Patents.

## VII.   Echelon's Blatant Infringement of Peloton's Famous Trademarks and Trade Dress

74.     Echelon has also infringed and continues to infringe on Peloton's trademark and trade dress rights.

75.     Peloton owns a federal trademark registration for the wordmark "PELOTON" (U.S. Reg. No. 4,580,888) ("Peloton Mark") for, among other things, stationary exercise bicycles and software monitoring and analyzing various parameters associated with the operation of a bicycle.  Peloton also owns a federal trademark registration for the wordmark "P" (U.S. Reg. No. 5,810,590) ("'P' Mark"), which comprises a stylized letter "P" represented at an angle and embedded within a crank-shaft design:



The registrations for the Peloton Mark and "P" Mark are valid and in full force and effect.

76.     Peloton has devoted significant marketing, advertising, and financial resources and creative energies towards the Peloton Mark and the stylized "P" Mark.  To reinforce the brand significance of the Peloton name and logo, Peloton's advertising and promotional efforts have established a connection in the minds of consumers between the wordmarks and Peloton's state-of-the-art, transformative fitness products.  As a result of these marketing and creation efforts, the Peloton Mark and "P" Mark are known nationally and internationally, and are widely recognized by the consuming public as a designation of source for Peloton Bikes and Peloton fitness products.  Peloton has more than 1.4 million members; and the company has acquired fame well beyond its userbase such that the Peloton Mark and "P" Mark are well known by the

28

general public.   The Peloton Bike has received near-universal adulation, with *Men's Health* naming it "the best cardio machine on the planet."   Peloton has become the market leader and is one of the most recognized brands for health and fitness.   As a result of extensive advertising, the state-of-the art quality of the Peloton Bike, and Peloton's commercial success, the Peloton Mark and "P" Mark have acquired significant goodwill and secondary meaning among the general public.   The marks are distinctive and famous.

77.      Peloton has also spent substantial resources in promoting the Peloton Bike using the distinctive look and feel of the product stemming from, among other things, the red, white, and black color scheme; white block lettering of the Peloton Mark; precise character spacing; location of the stylized "P" Mark; and aesthetic layout of both the Peloton Bike and the graphical user interface.   The combination of these nonfunctional elements and the total stylized appearance of the Peloton Bike is distinctive and identifies the bike as a Peloton product.   In virtually all of its advertisements, Peloton displays the distinct Peloton Bike and uses the black, red, and white color scheme with white block lettering and the "P" Mark to the left of the company name.   The Peloton website, for example, uses the same color scheme and fonts with the Peloton Bike and its distinct trade dress prominently featured throughout.   Like the Peloton Mark and "P" Mark, the distinctive Peloton trade dress has acquired significant goodwill and secondary meaning among the general public.   The distinctive look and feel of the Peloton Bike is known nationally and internationally, and is widely recognized by the consuming public as a designation of source for Peloton Bikes and Peloton fitness products.

78.      Echelon directly competes with Peloton.   In order to compete, Echelon purposefully embarked on an advertising and promotional campaign that uses a confusingly similar logo and a sound-a-like wordmark, and blatantly copied the distinctive look and feel of

the Peloton Bike.  Echelon willfully and intentionally infringed on Peloton's trademarks and trade dress in order to lure in and deceive confused customers into initially thinking that the Echelon Bikes are Peloton Bikes, or that the Echelon Bikes are in some way connected with, sponsored by, or affiliated with Peloton.  Instead of spending resources and developing its own marketing and distinct look, Echelon chose to free ride on the goodwill and secondary meaning Peloton has worked tremendously hard to develop.  Echelon commenced its unlawful infringement after the Peloton Mark, "P" Mark, and Peloton Bike trade dress became famous; indeed, Echelon purposefully sought to benefit from Peloton's fame and to dilute the goodwill associated with Peloton's marks and trade dress.

79.     In order to lure in confused customers and trade off the goodwill and reputation created and maintained by Peloton in the Peloton Mark and "P" Mark, Echelon has used and continues to use a sound-alike mark and a confusingly similar logo with a stylized letter "E" represented at an angle, both of which are likely to cause confusion, mistake, or deception in violation of Section 32(a) of the Lanham Act:



Echelon began using its unlawful marks after Peloton and the Peloton Mark and "P" Mark acquired nationwide fame among the general public.  Echelon's acts described herein constitute infringement of one or more of Peloton's federally registered trademarks and have caused, and will continue to cause, serious irreparable injury to Peloton and to the goodwill associated with the Peloton Mark and "P" Mark.

80.     In addition to use of the unlawful marks, Echelon has purposefully copied the Peloton Bike's distinct trade dress in order to lure in and deceive customers.  The Echelon Bikes imitate Peloton down to the placement of the similar round logo to the left of the company name in white block lettering and its use of a nearly identical red, white, and black color scheme, as shown below:

 

Peloton used its trade dress extensively and continuously before Echelon began advertising, promoting, selling, offering to sell, and distributing its infringing bikes, and the trade dress acquired fame among the general public before Echelon commenced its unlawful activities.

81.     The Echelon user interface (shown below, top) also copies the look and feel of the Peloton classes (shown below, bottom), including but not limited to its use of similar font, font size, coloring, and layout:





82.    Echelon's blatant imitation of Peloton's trade dress is pervasive.    Echelon purposefully lures in confused customers at every marketing touch point.  By using images of the copycat Echelon bike in advertisements and social media posts, Echelon confuses customers and generates deceptive initial interest in their products.  Echelon targets the same consumers and uses the same marketing touch points, including a website that is a blatant rip-off of the Peloton

design.  This includes, but is not limited to, the website headers, color scheme, font, spacing, and layout.  For example, the website header uses the same logo placement, white block lettering, spacing, and icon images:



The Echelon website (shown in the images on the left below) even copies exact language from the Peloton website (shown in the images on the right below).  The Peloton website first used the phrase "Never Ride Alone," which Echelon now uses in a similar page with an identical view of the Echelon Bike user interface:



And in promoting its membership rates, Echelon uses language identical to the Peloton website. Peloton first advertised on its website that "[w]ith the Peloton Membership, access every live and on-demand Peloton class across your devices for $39/month."  Echelon now advertises in similar

font, color, spacing, and design layout that "[w]ith the Echelon Membership, access every live and on-demand Echelon class across your devices for $39/month," as shown below:



83.      As a result of Echelon's activities related to the infringing products, there is a likelihood of confusion, mistake, or deception as to the source, affiliation, connection, or association of Echelon's bikes with Peloton, including by hooking customers at the initial point of contact with the Echelon Bikes.

84.      In fact, on August 28, 2019, *The New York Times* published an article that recognized Echelon's products as "***a blatant knockoff***, ***down to a round black logo***," of the Peloton Bike.[1]   *The New York Times* further reported that Echelon's Chief Executive Officer "acknowledged the similarities with Peloton but said Echelon's models were more affordable." And in one recent user comparison of the Echelon product to the Peloton Bike, an individual on Reddit.com wrote that "[e]ven the [Echelon] product font seems to be a bit of a ripoff of the peloton font."

---

[1] *See* https://www.nytimes.com/2019/08/28/technology/peloton-ipo.html.

85.     As a result of Echelon's wrongful conduct, Peloton has been damaged and will continue to be damaged in an amount to be determined at trial.  Among other harms, Echelon's unlawful activities have diluted and continue to dilute Peloton's famous trademarks and trade dress by associating Peloton's famous trademarks and trade dress with Echelon's products of inferior quality, and by impairing the distinctiveness of Peloton's famous trademarks and trade dress.

## VIII.   Echelon's Campaign of False Advertising and Unfair Competition

86.     After capturing confused customers with their unlawful activities, Echelon engages in a false advertising campaign to further undercut Peloton's customer base.  Echelon disseminated false and misleading information about the Echelon Bikes and the Peloton Bike throughout the country, including by misleading customers about the price of the parties' products, misrepresenting the breadth of Peloton's class content, and deflating the number of instructors Peloton has while inflating Echelon's own trainer base.  As a result, Echelon unfairly stole customers from Peloton and attracted funding from investment firms that reportedly brought Echelon's total valuation to over $100 million.

87.     By way of example, Echelon has presented a page on its website (*see* https://web.archive.org/web/20190808215116/https://echelonfit.com/pages/compare-the-ex3-and-peloton/) that purports to compare the Echelon Smart Connect EX3 Max Bike with the Peloton Bike.  A portion of that website is reproduced below:



88.     That page, which Echelon has presented at that URL since at least as early as August 1, 2019 – and, on information and belief, far longer – contains numerous false and misleading statements about the Echelon and Peloton Bikes.

89.     For example, Echelon's purported price comparison misleads customers by claiming that Peloton's "Bike Price" is $1,995, while Echelon's "Bike Price" is $999.  In fact, Peloton's "Bike Price" includes the actual bike ***and*** a display, while Echelon's stated "Bike Price" includes only the actual bike – customers are forced to use their own display device at a cost of hundreds of additional dollars, or to pay anywhere from $1,639.98 to $2,199 for a version of the Echelon Bike that includes a touchscreen.

90.    Echelon's own customer reviews show disappointment in Echelon's deceptive advertising:



91.    As another example, Echelon misrepresents that Peloton's workouts are limited to "'After The Ride' + Cross Training Workouts" while Echelon purportedly provides "'FitPass' featuring trainer-led yoga, stretching, pre-and-post workout sessions, meditations, pilates, kickboxing, Zumba and more."   In truth, Peloton workouts also include instructor-led yoga, stretching, pre- and post-workout content, meditation, bootcamp, indoor and outdoor running and walking, and more.   Indeed, all Peloton members are provided with access to the Peloton Digital app, which includes a full suite of workouts across ten fitness disciplines.

92.    As yet another example, Echelon falsely claims that Peloton only has 12 instructors; in fact, Peloton has 29 and counting.   Echelon also falsely claims that it has over 30 trainers; in fact, its website lists only 17 total trainers across all disciplines.

93.    By way of another example, Echelon has presented a post on its Facebook page that purports to compare the Echelon Smart Connect EX3 Max Bike with the Peloton Bike.   A portion of that post is reproduced below:



94.    That page, which Echelon presented on Facebook since at least as early as February 18, 2019, contains numerous false and misleading statements about the Echelon and Peloton Bikes.

95.    For example, Echelon misrepresents the price of Peloton's product by claiming the bike is $2,245 and shipping and assembly is $250.  In fact, the $2,245 price includes the Peloton Bike, display, and is inclusive of shipping and assembly.  Echelon, meanwhile, charges extra for both shipping and assembly.  Moreover, Echelon falsely claims that the price of Peloton's subscription is "$39/mo for annual sub." when in fact the pricing is $39 per month regardless of the length of subscription and with no minimum commitment.

96.    As described above, Echelon also misrepresents that Peloton's workouts are limited to "'After The Ride' + Cross Training Workouts."  In truth, Peloton workouts also

include instructor-led yoga, stretching, pre- and post-workout content, meditation, bootcamp, indoor and outdoor running and walking, and more.  Indeed, all Peloton members are provided with access to the Peloton Digital app, which includes a full suite of workouts.

### COUNT I
### (Infringement of the '590 Patent)

97.     Peloton incorporates all other allegations in this Complaint.

98.     Peloton is the owner of all rights, title, and interest in the '590 Patent.  The '590 Patent issued on July 17, 2018.

99.     The '590 Patent is valid and enforceable.

100.     In violation of 35 U.S.C. § 271(a), Defendant Echelon makes, uses, offers to sell, and sells the Echelon Bikes and thereby directly infringes the '590 Patent.  Echelon and the Echelon Bikes satisfy each and every limitation of one or more claims of the '590 Patent. Echelon thereby directly infringes one or more claims of the '590 Patent.

101.     In violation of 35 U.S.C. § 271(b), Defendant Echelon advertises to, sells to, encourages, and instructs third parties, including Echelon customers, to use the Echelon Bikes. Echelon thereby induces infringement of one or more claims of the '590 Patent, by having the specific intent to induce its customers to infringe the '590 Patent, despite knowledge that its customers' acts infringe the '590 Patent.

102.     In violation of 35 U.S.C. § 271(c), Defendant Echelon offers to sell and sells material components of the '590 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including Echelon's customers.  Echelon has thereby contributorily infringed and continues to contributorily infringe one or more of the claims of the '590 Patent, despite its knowledge that material components are especially made or

especially adapted for use in an infringement of the '590 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

103.    Echelon's ongoing infringement is willful with notice of the '590 Patent and its infringement as of the filing of Peloton's original complaint in this case dated October 8, 2019.

104.    Peloton has suffered and continues to suffer damages and irreparable harm because of Defendant Echelon's past and ongoing infringement.

105.    Unless Defendant Echelon's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

106.    Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## COUNT II
### (Infringement of the '315 Patent)

107.    Peloton incorporates all other allegations in this Complaint.

108.    Peloton is the owner of all rights, title, and interest in the '315 Patent.  The '315 Patent issued on June 18, 2019.

109.    The '315 Patent is valid and enforceable.

110.    In violation of 35 U.S.C. § 271(a), Defendant Echelon makes, uses, offers to sell, and sells the Echelon Bikes and thereby directly infringes the '315 Patent.  Echelon and the Echelon Bikes satisfy each and every limitation of one or more claims of the '315 Patent. Echelon thereby directly infringes one or more claims of the '315 Patent.

111.    In violation of 35 U.S.C. § 271(b), Defendant Echelon advertises to, sells to, encourages, and instructs third parties, including Echelon customers, to use the Echelon Bikes. Echelon thereby induces infringement of one or more claims of the '315 Patent, by having the

specific intent to induce its customers to infringe the '315 Patent, despite knowledge that its customers' acts infringe the '315 Patent.

112.    In violation of 35 U.S.C. § 271(c), Defendant Echelon offers to sell and sells material components of the '315 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including Echelon's customers.  Echelon has thereby contributorily infringed and continues to contributorily infringe one or more of the claims of the '315 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '315 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

113.    Defendant Echelon's ongoing infringement is willful with notice of the '315 Patent and its infringement as of the filing of Peloton's original complaint in this case dated October 8, 2019.

114.    Peloton has suffered and continues to suffer damages and irreparable harm because of Defendant Echelon's past and ongoing infringement.

115.    Unless Defendant Echelon's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

116.    Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

### COUNT III
### (Infringement of the '026 Patent)

117.    Peloton incorporates all other allegations in this Complaint.

118.    Peloton is the owner of all rights, title, and interest in the '026 Patent.  The '026 Patent issued on November 26, 2019.

119.    The '026 Patent is valid and enforceable.

120.    In violation of 35 U.S.C. § 271(a), Defendant Echelon makes, uses, offers to sell, and sells the Echelon Bikes and thereby directly infringes the '026 Patent.  Echelon and the Echelon Bikes satisfy each and every limitation of one or more claims of the '026 Patent. Echelon thereby directly infringes one or more claims of the '026 Patent.

121.    In violation of 35 U.S.C. § 271(b), Defendant Echelon advertises to, sells to, encourages, and instructs third parties, including Echelon customers, to use the Echelon Bikes. Echelon thereby induces infringement of one or more claims of the '026 Patent, by having the specific intent to induce its customers to infringe the '026 Patent, despite knowledge that its customers' acts infringe the '026 Patent.

122.    In violation of 35 U.S.C. § 271(c), Defendant Echelon offers to sell and sells material components of the '026 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including Echelon's customers.  Echelon has thereby contributorily infringed and continues to contributorily infringe one or more of the claims of the '026 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '026 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

123.    Defendant Echelon's ongoing infringement is willful with notice of the '026 Patent and its infringement as of the filing of this Complaint.

124.    Peloton has suffered and continues to suffer damages and irreparable harm because of Defendant Echelon's past and ongoing infringement.

125.    Unless Defendant Echelon's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

126.     Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## COUNT IV
**(Trademark Infringement in Violation of Section 32(1) of the Lanham Act)**

127.     Peloton incorporates all other allegations in this Complaint.

128.     Peloton is owner of the federally registered Peloton Mark and federally registered "P" Mark, which Peloton uses in connection with the promotion and sale of state-of-the-art fitness products.  The registrations for the Peloton Mark and "P" Marks are valid and in full force and effect.

129.     Echelon directly competes with Peloton and has intentionally, knowingly, deliberately, and willfully infringed and continues to intentionally, knowingly, deliberately, and willfully infringe on the Peloton Mark and the "P" Mark in connection with the sale of the Echelon Bikes.  Echelon intentionally, knowingly, deliberately, and willfully uses in commerce marks and logos that are likely to cause confusion, mistake, or deception in violation of Section 32 of the Lanham Act.  Echelon intended to use marks likely to cause confusion among the consuming public in order to lure in and deceive customers into thinking their similar product is a Peloton Bike or is otherwise affiliated with, sponsored by, or connected with Peloton.  Echelon targets the same customers as Peloton through similar marketing channels.

130.     As a direct and proximate cause of the infringing acts, Peloton has been damaged in an amount to be determined at trial.  Peloton has suffered and continues to suffer immediate and irreparable injury for which it has no adequate remedy at law.  Peloton is entitled to injunctive relief and up to three times its actual damages and/or an award of Defendant Echelon's profits, as well as costs and Peloton's reasonable attorneys' fees under 15 U.S.C. §§ 1116–17.

## COUNT V
### (Trade Dress Infringement in Violation of Section 43(a) of the Lanham Act)

131.    Peloton incorporates all other allegations in this Complaint.

132.    The Peloton Bike has a distinctive look and feel stemming from, among other things, the red, white and black color scheme, white block lettering of the Peloton Mark, precise character spacing, location of the stylized round "P" Mark, and aesthetic layout of both the Peloton Bike and the graphical user interface.  Purchasers of the Peloton Bike associate this distinctive appearance and overall feel with Peloton.  The combination of these nonfunctional elements, among others, and the total impression of the Peloton Bike is sufficiently distinctive that this trade dress identifies Peloton as the source of the Peloton Bike.  Peloton has also extensively advertised the Peloton Bike.  Through that extensive and continuous use and promotion, the Peloton Bike's trade dress has become a well-known indicator of the origin and state-of-the-art quality of Peloton Bikes and has acquired secondary meaning.  The distinct trade dress acquired secondary meaning before Echelon commenced its unlawful infringement.

133.    Echelon has intentionally, knowingly, deliberately, and willfully infringed and continues to intentionally, knowingly, deliberately, and willfully infringe on Peloton's trade dress rights through its blatant imitation of the Peloton Bike in interstate commerce.  This includes, but is not limited to, the use of the same color scheme, white block lettering, location of the similar marks on the bike frame, and aesthetic layout of the Echelon Bike and the graphic user interface (which uses the similar fonts, color, and layout).  Echelon's copycat products are likely to cause confusion, mistake, or deception as to the source, affiliation, connection, or association of Echelon's bikes with Peloton.  This includes the confusion, mistake, or deception that creates initial customer interest in the Echelon Bikes.

134.    As a result of Echelon's infringement of Peloton's trade dress, Peloton has suffered substantial damages, as well as the continuing loss of the goodwill and reputation established by Peloton in its trade dress.  Peloton has suffered and continues to suffer immediate and irreparable injury for which it has no adequate remedy at law.  Peloton is entitled to injunctive relief and up to three times its actual damages and/or an award of Defendant Echelon's profits, as well as costs and Peloton's reasonable attorneys' fees under 15 U.S.C. §§ 1116–17.

## COUNT VI
## (Trademark and Trade Dress Dilution in Violation of Section 43(c) of the Lanham Act)

135.    Peloton incorporates all other allegations in this Complaint.

136.    The Peloton Mark, "P" Mark, and Pelton Bike trade dress are famous and entitled to protection under Section 43(c) of the Lanham Act.  Each of the Peloton Mark, "P" Mark, and Peloton Bike trade dress is widely recognized by the general consuming public of the United States as a designation of the source of Peloton and Peloton's state-of-the-art health and fitness products.  Through extensive and continuous advertising and promotion, the Peloton Mark, "P" Mark, and Peloton Bike trade dress acquired fame nationwide among the general public and acquired secondary meaning before Echelon commenced its unlawful use of Peloton's trade dress and unlawful marks in connection with the infringing Echelon Bikes.

137.    Due to Echelon's willful and knowing unlawful conduct, Echelon is likely to dilute, has diluted, and continues to dilute Peloton's marks and trade dress by and not limited to blurring the public's exclusive association of Peloton's famous marks and trade dress with Peloton's products, by lessening the capacity of Peloton's famous marks and trade dress to distinguish Peloton's products, and by associating Peloton's famous marks and trade dress with lesser quality Echelon Bikes.

138.    As a result of Echelon's infringement of Peloton's trade dress, Peloton has suffered substantial damages, as well as the continuing loss of the goodwill and reputation. Peloton has suffered and continues to suffer immediate and irreparable injury for which it has no adequate remedy at law.  Peloton is entitled to injunctive relief and actual damages and/or an award of Defendant Echelon's profits, as well as costs and Peloton's reasonable attorneys' fees under 15 U.S.C. §§ 1116–17.

## COUNT VII
### (Trademark and Trade Dess Dilution in Violation of DTA, 6 Del. Code § 3313, et seq.)

139.    Peloton incorporates all other allegations in this Complaint.

140.    The Peloton Mark, "P" Mark, and Pelton Bike trade dress are famous and entitled to protection under the Delaware Trademark Act.  Each of the Peloton Mark, "P" Mark, and Peloton Bike trade dress is widely recognized by the general consuming public of the United States as a designation of the source of Peloton and Peloton's state-of-the-art health and fitness products.  Through extensive and continuous advertising and promotion, the Peloton Mark, "P" Mark, and Peloton Bike trade dress acquired fame nationwide among the general public and acquired secondary meaning before Echelon commenced its unlawful use of Peloton's trade dress and unlawful marks in connection with the infringing Echelon Bikes.

141.    Due to Echelon's willful and knowing unlawful conduct, Echelon is likely to dilute, has diluted, and continues to dilute Peloton's marks and trade dress by and not limited to blurring the public's exclusive association of Peloton's famous marks and trade dress with Peloton's products, by lessening the capacity of Peloton's famous marks and trade dress to distinguish Peloton's products, and by associating Peloton's famous marks and trade dress with lesser quality Echelon Bikes.

142.    As a result of Echelon's infringement of Peloton's trade dress, Peloton has suffered substantial damages, as well as the continuing loss of the goodwill and reputation. Peloton has suffered and continues to suffer immediate and irreparable injury for which it has no adequate remedy at law.   Peloton will continue to suffer irreparable harm unless this Court enjoins Echelon's conduct.

### COUNT VIII
### (False Advertising in Violation of Section 43(a) of the Lanham Act)

143.    Peloton incorporates all other allegations in this Complaint.

144.    After intentionally luring in customers with its unlawful marks and trade dress, Defendant Echelon has made literally false and misleading statements of fact about both Echelon's and Peloton's products in violation of 15 U.S.C. § 1125(a).   Those statements misrepresent the nature, characteristics, and/or qualities of Echelon and Peloton and are expressly false, impliedly false, or both.   Echelon has misrepresented the pricing of the parties' products.   For instance, Echelon misrepresents the price of Peloton's product by claiming the bike is $2,245 and shipping and assembly is $250.   In fact, the $2,245 price includes the Peloton Bike, display, and is inclusive of shipping and assembly.   Moreover, Echelon falsely claims that the price of Peloton's subscription is "$39/mo for annual sub." when in fact the pricing is $39 per month regardless of the length of subscription and with no minimum commitment.   Echelon also misrepresents the parties' product offerings, falsely claiming that Peloton's workouts are limited to "'After The Ride' + Cross Training Workouts" and that Peloton only has 12 instructors while Echelon has over 30—Peloton actually has 29, while Echelon has only 17 trainers featured on its website.

145.    Defendant Echelon has knowingly induced and/or caused third parties—including customers that read Echelon's false advertisements—to engage in additional acts of false advertising by repeating Echelon's false statements.

146.    Defendant Echelon knew or should have known that its advertising was false, misleading, and deceptive.

147.    Defendant Echelon's false and misleading statements have deceived and have the tendency to deceive a substantial segment of its intended audience about matters material to purchasing decisions. Echelon's violations have caused harm to the public and, unless restrained, will further damage the public.

148.    Peloton's and Defendant Echelon's products are offered in interstate commerce. Similarly, Echelon's false and misleading statements were and are made in commercial advertising and promotion in interstate commerce.

149.    Defendant Echelon's violations have proximately harmed Peloton. As a result of Echelon's violations, Peloton has suffered and will continue to suffer damage to its business and goodwill.  Peloton has lost and will continue to lose sales and profits and incur increased advertising and marketing costs.

150.    Peloton's immediate, irreparable injuries have no adequate remedy at law, and Peloton is entitled to injunctive relief and up to three times its actual damages and/or an award of Defendant Echelon's profits, as well as costs and Peloton's reasonable attorneys' fees under 15 U.S.C. §§ 1116–17.

## COUNT IX
### (Violation of Delaware Common Law – Trade Libel)

151.   Peloton incorporates all other allegations in this Complaint.

152.   Defendant Echelon has made false and misleading statements of fact about both Echelon's and Peloton's products.  Those statements misrepresent the nature, characteristics, and/or qualities of Echelon and Peloton and are expressly false, impliedly false, or both.  As explained above, Echelon has misrepresented the pricing of the parties' products.  For instance, Echelon misrepresents the price of Peloton's product by claiming the bike is $2,245 and shipping and assembly is $250.  In fact, the $2,245 price includes the Peloton Bike, display, and is inclusive of shipping and assembly.  Moreover, Echelon falsely claims that the price of Peloton's subscription is "$39/mo for annual sub." when in fact the pricing is $39 per month regardless of the length of subscription and with no minimum commitment.  Echelon also misrepresents the parties' product offerings, falsely claiming that Peloton's workouts are limited to "'After The Ride' + Cross Training Workouts" and that Peloton only has 12 instructors while Echelon has over 30—Peloton actually has 29, while Echelon has only 17 trainers featured on its website.

153.   Defendant Echelon has knowingly induced and/or caused third parties—including customers that read Echelon's false advertisements—to engage in additional acts of false advertising by repeating Echelon's false statements.

154.   Defendant Echelon knew or should have known that its advertising was false, misleading, and deceptive.

155.   Defendant Echelon's false and misleading statements have deceived and have the tendency to deceive a substantial segment of its intended audience about matters material to purchasing decisions. Echelon's violations have caused harm to the public and, unless restrained, will further damage the public.

156.    Defendant Echelon's violations have proximately harmed Peloton. As a result of Echelon's violations, Peloton has suffered and will continue to suffer damage to its business and goodwill. Peloton has and will lose sales and profits and incur increased advertising and marketing costs.

157.    Defendant Echelon has acted with oppression, fraud, or malice, entitling Peloton to an award of punitive damages.

158.    Defendant Echelon has acted willfully, in bad faith, and with malice. Unless restrained, Echelon will continue to cause further irreparable competitive and commercial injury to Peloton.

159.    Peloton's immediate, irreparable injuries have no adequate remedy at law, and Peloton is entitled to injunctive relief and up to three times its actual damages and/or an award of Defendant Echelon's profits, as well as costs and Peloton's reasonable attorneys' fees.

**COUNT X**
**(Violation of Delaware Deceptive Trade Practices Act 6 Del. Code § 2531, *et seq*.)**

160.    Peloton incorporates all other allegations in this Complaint.

161.    Defendant Echelon has made false and misleading statements of fact about both Echelon and Peloton's products. Those statements misrepresent the nature, characteristics, and/or qualities of Echelon and Peloton and are expressly false, impliedly false, or both.  As explained above, Echelon misrepresents the price of Peloton's product by claiming the bike is $2,245 and shipping and assembly is $250.  In fact, the $2,245 price includes the Peloton Bike, display, and is inclusive of shipping and assembly.  Moreover, Echelon falsely claims that the price of Peloton's subscription is "$39/mo for annual sub." when in fact the pricing is $39 per month regardless of the length of subscription and with no minimum commitment.  Echelon also misrepresents the parties' product offerings, falsely claiming that Peloton's workouts are limited

to "'After The Ride' + Cross Training Workouts" and that Peloton only has 12 instructors while Echelon has over 30—Peloton actually has 29, while Echelon has only 17 trainers featured on its website.

162.    Echelon's false and misleading statements constitute unfair deceptive trade practices in violation of the Delaware Deceptive Trade Practices Act 6 Del. Code § 2531, *et seq*., and specifically including, for example, § 2532(a)(5), (8), and (12).

163.    Defendant Echelon knew or should have known that its advertising was false, misleading, and deceptive.

164.    Defendant Echelon's false and misleading statements have deceived and have the tendency to deceive a substantial segment of its intended audience about matters material to purchasing decisions.  Echelon's violations have caused harm to the public and, unless restrained, will further damage the public.

165.    Peloton's and Defendant Echelon's products are offered in interstate commerce. Similarly, Echelon's false and misleading statements were and are made in commercial advertising and promotion in interstate commerce.

166.    Defendant Echelon's violations have proximately harmed Peloton. As a result of Echelon's violations, Peloton has suffered and will continue to suffer damage to its business and goodwill.  Peloton has lost and will continue to lose sales and profits and incur increased advertising and marketing costs.

167.    Peloton's immediate, irreparable injuries have no adequate remedy at law, and Peloton is entitled to injunctive relief.  On information and belief, Echelon has willfully engaged in its deceptive trade practices and Peloton is entitled to costs and reasonable attorneys' fees pursuant to 6 Del. Code § 2533(b).  In addition, pursuant to 6 Del. Code § 2533(c), Peloton is

entitled to treble the amount of its actual damages for Echelon's violations of Delaware common law and other statutes.

## PRAYER FOR RELIEF

WHEREFORE, Peloton respectfully asks that the Court enter judgment against Defendant Echelon as follows:

168.    That Defendant Echelon has infringed (either literally or under the doctrine of equivalents) directly, jointly, and/or indirectly by way of practicing, inducing or contributing to the infringement of one or more claims of the Peloton Patents;

169.    For temporary, preliminary, and permanent injunctive relief enjoining Defendant Echelon and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with it, from infringement, inducing the infringement, or contributing to the infringement of the Peloton Patents;

170.    For an award to Peloton for its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant Echelon's infringement of the Peloton Patents;

171.    For an award to Peloton for enhanced damages equal to treble the amount of actual damages, for the willful nature of Defendant Echelon's acts of infringement as to the Peloton Patents, with notice being made at least as early as the filing of Peloton's complaint dated October 9, 2019 for the '590 and '315 Patents, and at least as early as the filing of this Complaint for the '026 Patent;

172.    That Defendant Echelon has violated federal and state law in engaging in unfair competition, false advertising, trade libel, trademark infringement, trade dress infringement, trademark and trade dress dilution, and deceptive trade practices;

173.    For temporary, preliminary, and permanent injunctive relief enjoining Defendant Echelon and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with it, from engaging in further acts of unfair competition, false advertising, trademark infringement, trade dress infringement, trademark and trade dress dilution, and deceptive trade practices;

174.    For an award to Peloton for its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant Echelon's unlawful acts of unfair competition, false advertising, trade libel, trademark infringement, trade dress infringement, trademark and trade dress dilution, and deceptive trade practices;

175.    For an award to Peloton for profits earned by Defendant Echelon attributable to its unlawful acts of unfair competition, false advertising, trade libel, trademark infringement, trade dress infringement, trademark and trade dress dilution, and deceptive trade practices;

176.    A declaration that this is an "exceptional case" due to the willful nature of Defendant Echelon's false advertising, trademark infringement, trade dress infringement, and trademark and trade dress dilution, and awarding damages and attorneys' fees and costs to Peloton pursuant to 15 U.S.C. § 1117, and any other damages including treble damages and attorneys' fees to the full extent allowable under the law;

177.    Reasonable attorneys' fees and costs against Defendant Echelon; and

178.    For any and all other relief to which Peloton may show itself to be entitled.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury for all issues so triable.

OF COUNSEL:

Steven N. Feldman
Christina V. Rayburn
Karen Younkins
Maxwell K. Coll
Kevin X. Wang
HUESTON HENNIGAN LLP
523 West Sixth Street, Suite 400
Los Angeles, CA 90014
(213) 788-7272

January 10, 2020

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael Flynn*

_____
Michael Flynn (#5333)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mflynn@mnat.com
araucci@mnat.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*