**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PELOTON INTERACTIVE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:19-cv-1903-RGA |
| | ) | |
| ECHELON FITNESS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT ECHELON FITNESS, LLC'S OPENING BRIEF
IN SUPPORT OF ITS RENEWED MOTION TO DISMISS
<u>PLAINTIFF'S PATENT INFRINGEMENT CLAIMS</u>**

OF COUNSEL:

Douglas R. Weider
James L. Ryerson
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Phone:  (973) 360-7900
weiderd@gtlaw.com
ryersonj@gtlaw.com

Dated:  January 17, 2020

GREENBERG TRAURIG, LLP

Benjamin J. Schladweiler (#4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE  19801
Phone:  (302) 661-7000
schlwadweilerb@gtlaw.com

*Attorney for Defendant Echelon Fitness,
LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      NATURE AND STAGE OF PROCEEDINGS ................................................... 1

II.     SUMMARY OF ARGUMENT ......................................................................... 1

III.    STATEMENT OF FACTS................................................................................ 2

        A.      The Parties.......................................................................................... 2
        B.      The Patents-in-Suit............................................................................. 2

                1.      The Patents-In-Suit Do Not Solve A Technological Problem ................... 3
                2.      The Abstract Idea Is Carried Out Using Generic Components.................. 3
                3.      The Patents Do Not Disclose Any Specific Or Unconventional
                        Methods For Carrying Out The Abstract Idea ........................................ 4
                4.      The Claims Of The Patents-in-Suit ........................................................ 6

        C.      Allegations in the Amended Complaint ............................................... 7
        D.      Related Litigations and Inter Partes Review Proceedings .................... 8

IV.     ARGUMENT ..................................................................................................... 9

        A.      Legal Standards Governing Echelon's Motion To Dismiss................... 9
        B.      The Claims Of The Patents-in-Suit Are Directed To The Abstract Idea Of
                Making Competitive Exercise Classes Available Online................... 10

                1.      Legal Standards Governing Step One Of The Alice Analysis ................ 10
                2.      The Asserted Claims Are "Directed To" An Abstract Idea ..................... 11

        C.      The Claims Do Not Include An "Inventive Concept" Such That They
                Cover Significantly More Than The Abstract Idea Itself................... 13

                1.      Legal Standards Governing Step Two Of The Alice Analysis ................ 13
                2.      The Asserted Claims Do Not Contain An "Inventive Concept"............... 15
                3.      The Amended Complaint Does Not Plausibly Allege The Claims
                        Recite An "Inventive Concept.".............................................................. 17
                4.      The Remaining Dependent Claims Do Not Include An "Inventive
                        Concept."................................................................................................ 20

V.      CONCLUSION .............................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
  838 F.3d 1266 (Fed. Cir. 2016) ....................................................................... *passim*

*Alice Corp. v. CLS Bank International*,
  573 U.S. 208 (2014) ................................................................................................10, 14

*Ameranth, Inc. v. Domino's Pizza, LLC*,
  2019 WL 5681315 (Fed. Cir. Nov. 1, 2019) ...................................................................16

*Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*,
  351 F. Supp. 3d 753 (D. Del. 2019), aff'd, No. 2019-1511, 2019 WL 5703890
  (Fed. Cir. Nov. 5, 2019) ...............................................................................................11, 14

*Berkheimer v. HP Inc.*,
  890 F.3d 1369 (Fed. Cir. 2018) ...........................................................................................9

*In re Bilski*,
  561 U.S. 593 (2010) ............................................................................................................13

*Broadsoft, Inc., v. CallWave Commc'ns, LLC*,
  282 F. Supp. 3d 771 (D. Del. 2017) .............................................................................12, 20

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ....................................................................... *passim*

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019) .........................................................................................13

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ..........................................................................11, 12, 17, 18

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ...........................................................................................6

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ..........................................................................11, 14, 15, 16

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ....................................................................................10, 13

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) .........................................................................................11

*McRo Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ....................................................................................10, 13

*Peloton Interactive, Inc. v. Flywheel Sports, Inc.*,
  No. 2:18-cv-390 (E.D. Tex. Sept. 5, 2019) ........................................................................9

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) .........................................................................................17

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ...................................................................................9, 14, 19

*Synopsis, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016) ....................................................................................18, 19

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) .........................................................................................11, 13

*Two-Way Media Ltd v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ..............................................................................................10

**Statutes**

35 U.S.C. § 101 .................................................................................................................1, 9, 11, 20

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................1

## I.   NATURE AND STAGE OF PROCEEDINGS

In its Amended Complaint,[1] Plaintiff Peloton Interactive, Inc. ("Peloton") alleges Defendant Echelon Fitness, LLC ("Echelon") (i) infringes U.S. Patent Nos. 10,322,315 (D.I. 16-2, "the '315 patent"), 10,022,590 (D.I. 16-1, "the '590 patent") and 10,486,026 (D.I. 16-3, "the '026 patent") (collectively, "the patents-in-suit") and (ii) engaged in trademark infringement, trademark dilution, and false advertising.  (D.I. 16).

The patents-in-suit seek to cover the abstract idea of making competitive exercise classes available online.  Because the patents-in-suit are directed to patent ineligible subject matter under 35 U.S.C. § 101, the Court should dismiss Counts I, II and III of the Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.   SUMMARY OF ARGUMENT

1.      As Peloton tells it, since 2012, it has been "disrupting the fitness category" by offering "the Peloton Bike": "a sleek, technologically advanced system that combines a first-in-class exercise bike with state-of-the-art technology that allows riders to experience live and on-demand cycling classes . . . from the comfort of their own homes." (D.I. 16 at ¶ 17).  And if the patents-in-suit claimed a "technologically advanced system," a "first-in-class exercise bike," or "state-of-the-art technology," they may very well have been patent eligible.  But as the specification and Amended Complaint make clear, what the patents-in-suit seek to broadly cover is the "from the comfort of their own homes" aspect of the story, by "*re-creating*" at home over the Internet "*the same* in-studio cycling class experience" offered by companies like Flywheel and SoulCycle.  (D.I. 16 at ¶¶ 18, 23, 26 (emphasis added)).

2.      The claims of the patents-in-suit are directed to the abstract idea of making

---

[1] Peloton's initial Complaint alleged infringement of the '315 and '590 patents.  (D.I. 1). Echelon moved to dismiss on eligibility grounds.  (D.I. 9, 10).  In lieu of responding, Peloton moved to file an Amended Complaint adding the '026 patent, which issued on November 26, 2019.  (D.I. 16).   The motion was unopposed and the Court granted leave to amend.  (D.I. 15).

competitive exercise classes available online because the focus of the claims is the resulting abstract idea and not any specific – let alone technologically improved – means for doing so. Indeed, the specification acknowledges that the problem sought to be solved is a human one – the accessibility to competitive cycling classes – and not a technological one.

3.      The claims do not contain an inventive concept.  The alleged improvement is that making the classes available online enables riders to compete "at home on their own schedule" and to compete "against hundreds (for a live class) or even thousands (for an on-demand class)." (D.I. 16 at ¶¶ 18-19).  But these benefits flow from the abstract idea itself, which cannot supply the inventive concept.  Neither the claims nor the specification reference anything but routine and conventional techniques for recreating the experience online.

4.      The Complaint's conclusory allegations regarding purported inventive concepts do not create fact issues because they contradict the clear intrinsic record and cannot overcome Peloton's admission that its invention was "re-creating" in-studio exercise classes at home.

## III.   STATEMENT OF FACTS

### A.      The Parties

Echelon is a fitness company headquartered in Chattanooga, Tennessee that offers "smart" fitness products, like the accused Echelon Smart Connect Bikes, which allow consumers to participate in cycling classes from their own homes.  (D.I. 16 at ¶¶ 12, 68).

Peloton, a New York-based, publicly-traded company, claims that it "revolutionized the fitness industry with its category-creating at-home cycling bike, the Peloton Bike." (*Id*. at ¶¶ 11, 17).  This new "category" seeks to "re-creat[e] the energetic and competitive in-studio cycling experience at home" by allowing users to stream classes over the Internet.  (*Id*. at ¶ 18).  When Echelon threatened Peloton's alleged monopoly, Peloton filed suit.

### B.      The Patents-in-Suit

The '590, '315 and '026 patents share a common specification and issued on July 17,

2

2018, June 18, 2019, and Nov. 26, 2019, respectively.[2]  The '315 patent seeks to patent the idea

of "providing streaming and on-demand exercise classes" (i.e., making them available online).

('315 patent at 1:30-31).  The '026 patent seeks to patent the same abstract idea as the '315

patent but limited to on-demand exercise classes (i.e., archived classes). The '590 patent seeks

to patent the same abstract idea as the '315 patent, but limited to field of cycling classes.

### 1.    The Patents-In-Suit Do Not Solve A Technological Problem

The patents-in-suit make no mention of—let alone purport to solve—any technical

challenges associated with making competitive exercise or cycling classes available online.

Instead, the problem encountered was one of convenience: that classes at gyms and studios

"are accessible only at specific times and locations" and therefore "unavailable to many

potential users," "very expensive," and "often sell-out." ('315 patent at 1:61-64).  To avoid

these inconveniences, the patents-in-suit disclose the idea of "providing streaming and on-

demand exercises classes" online (*id*. at 1:29-31)—much like how televisions, TIVO, DVRs,

and various streaming services allowed fans to watch sporting events at home, either live or on

demand, or how some colleges allow classes to be taken live or on demand over the Internet.

### 2.    The Abstract Idea Is Carried Out Using Generic Components

The specification makes clear that the patents-in-suit seek to broadly cover the idea of

making competitive exercise classes available online using any suitable components.  In fact,

despite that the claims of the '315 and '026 patents are drawn to "exercise classes" generally,

the only type of exercise class disclosed in the specification is cycling.  Consistent with the

abstract and aspirational nature of the claims, no other exercise equipment (e.g., a treadmill, an

elliptical, or a stair climber) is even mentioned.

Even as to the disclosed cycling embodiment, the specification does not describe any

specialized, much less new or improved, hardware or related components.

---

[2] Citations are only to the '315 patent unless otherwise noted.

**No new display screen**.  The bike may include a generic display screen that may be "any size" and can be "mounted directly" to the bike, "otherwise placed within the viewing area," or adjusted by the user using "[v]arious mechanisms." ('315 patent at 6:37-41 & 15-24).[3] The display screen's function is no more specific:  it may display "a range of information," "a range of performance metrics," and "a range of different controls."  (*Id.* at 6:42-45).

**No new user interface**.  The display screen may include a "user interface."  ('315 patent at 7:1-2).  The patents-in-suit do not contend the user interface is novel or that it has any particular design or function.   Instead, the user interface "may present a variety of screens" (*id.* at 7:12-13) and "a wide range of control and informational windows" (*id.* at 6:50-51).

**No new sensors**.  Like their "in-studio" counterparts, the bikes "may be equipped with "various sensors" that can measure a "range of performance metrics," such as "speed," "pedal cadence," "heart-rate," or "any other physical characteristic."   ('315 patent at 5:46-57).

**No new computer hardware**.  The computer hardware is generically described as potentially including "digital storage, processing and communications hardware, software and/or one or more media input/output devices . . ." that "may be connected to or integrated with the stationary bike" or "wirelessly connected to the stationary bike" (*id.* at 5:24-32).

**No new communication network.**  To carry out "re-creating" "the same" in-studio experience at home, "[a]ccess to any appropriate communications network such as the internet may be used to provide information to and receive information from other stationary bikes or . . . a backend system or platform."  ('315 patent at 10:29-33).   The communications between components may "us[e] any appropriate protocol and technology." (*Id.* at 5:36-39).

>   **3.**     **The Patents Do Not Disclose Any Specific Or Unconventional Methods For Carrying Out The Abstract Idea**

The generality of the patents-in-suit with respect to the hardware also extends to the

---

[3] All emphasis is added unless otherwise stated.

methods (or lack thereof) disclosed for achieving the desired results.

**No specific or unconventional methods for providing classes for selection.**   The patents-in-suit describe the result that the user is presented a "variety of screens" regarding "scheduled classes" and "the user can select among both live and archived content" ('315 patent at 7:12-33).   But the specification does not purport to disclose any unconventional or specific methods for providing content for selection, which is not surprising given that the ability to select from live or recorded video streams is routine technology on computers, televisions and DVRs made available via the Internet or cable providers.

**No specific or unconventional methods for providing video of the class.**   The patents-in-suit describe the result that live and archived class content is "created and stored in various local or remote locations and shared across the networked exercise system." ('315 patent at 11:14-17).   But the video delivery implementation is "exemplary only" and "can be implemented through a variety of different system architectures . . . ." (*Id.* at 11:14-21).

**No specific or unconventional methods for comparing users' performance parameters on a leaderboard**.   The patents-in-suit describe the result of comparing "performance information about other users . . . on [a] leaderboard . . . that can be sorted by relevant performance parameters." ('315 patent at 9:27-29).   But the only details disclosed for achieving the result is that the "local system . . . can access . . . display information relating to other users either directly through a distributed platform or indirectly through a central platform regardless of their location" and that the "user interface" on the "local system" "may present one or more windows that may display to the user . . . their position on a leaderboard as compared to a peer group." (*Id.* at 10:32-26 & 10:57-64).

**No specific or unconventional methods for synchronizing performance data.** The patents-in-suit describe the result of providing "synchronized live and/or archived . . . sensor data to users over the network."   ('315 patent at 13:39-41).   But the only detail

provided for *how* to perform synchronization is the use of a "start signal that serves as the starting time point for the data comparison" (*id.* at 13:60-61)—hardly unconventional given races and competitions routinely use "start signals" to "synchronize" the start of the event. For example, leaderboards in downhill skiing events compare and "synchronize" live and archived times from racers who received a start signal and began the race from the same starting gate.

### 4.       The Claims Of The Patents-in-Suit

The claims of the patents-in-suit are no more specific. Independent claim 1 of the '315 patent, which is representative of the other claims,[4] recites the following high-level steps for carrying out the idea of making competitive exercise classes available online:

> 1. A method for displaying live and archived exercise classes comprising:
>
> displaying information about available live and archived exercise classes that can be accessed by a first user via a digital communication network on a display screen at a first location, wherein the first user can select either a live exercise class or select among a plurality of archived exercise classes;
>
> receiving a selection of one of the available live or archived exercise classes by the first user;
>
> outputting digital video and audio content comprising the selected exercise class at the first location to the first user;
>
> determining one or more performance parameters for the first user at the first location at a plurality of points in the selected exercise class;
>
> displaying at least one performance parameter for the first user at the first location on the display screen; and
>
> dynamically displaying one or more performance parameters for a second user at a second location on the display screen at the first location such that at least one of the performance parameters for the first user at the plurality of points in the selected exercise class and at least one of the performance parameters for the second user at the same points in the selected exercise class are presented for comparison on the display screen at the first location.

---

[4] Courts may use representative claims to analyze patent eligibility where, as here, "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

The remaining independent claims of the patents-in-suit are all substantially similar, except: (1) claim 11 of the '315 patent is couched as a method for "providing" (not "displaying") live and archived exercise classes; (2)  claim 1 of '590 patent is (i) limited to cycling classes and (ii) couched as a system having the generic "user interface," input device," "sensors" and "local processing system" discussed in the specification; and (3) claims 1 and 11 of the '026 patent are limited to the "'archived class' class aspects of the inventions claimed in the '590 patent and '315 patents." (D.I. 16 at ¶ 61).[5]

The dependent claims of the patents-in-suit add more conventional components or features.  Some of the dependent claims of the '590 patent add conventional components, like a stationary cycle (claim 2) and its frame, flywheel, pedals, and resistance adjusting apparatus (claim 3).  Other dependent claims of the patents-in-suit add routine steps or functions, like displaying a leaderboard based on comparative performance parameters ('315 patent, claims 6 and 16, '590 patent, claim 15 and '026 patent, claims 8 and 13) and synchronizing live and archived data for display ('315 patent, claims 7 and 17).

### C.   Allegations in the Amended Complaint

Like the specification, the Amended Complaint concedes in-studio, cycling classes offered by Flywheel and SoulCycle "provide[d] a great consumer experience," but because such "classes can be hard to attend," the inventors sought to "re-create" "*the same* in-studio cycling class experience" for home users.  (D.I. 16 at ¶¶ 18, 23, 26 (emphasis added)).

The Amended Complaint also portrays the "Peloton Bike" as a "visually appealing, sturdy, and technologically advanced exercise bike" that offers features like a "large,

---

[5]   The independent claims of the '026 patent also require "synchroniz[ing]" the "archived performance data" for comparison with the "first user performance data. Although the words "synchronized" or "synchronizing" do not appear in the independent claims of the '315 and '590 patent, Peloton nonetheless alleges that, "for an archived class," the independent claims of the '315 and '590 patent implicitly require that the archived performance data be "time-shifted" (i.e., synchronized) (D.I. 16 at ¶ 55).  For purposes of this motion only, Echelon has accepted Peloton's claim constructions as correct.

sweatproof, wi-fi enabled, high-definition touchscreen tablet computer," and an "attractive graphical user interface." (*Id*. at ¶ 29).  But Peloton's commercial bike is not the focus of the § 101 inquiry, and none of these features appear in the claims.  Indeed, *none* of the independent claims require a bike and the claims of the '315 and '026 patents are not even limited to cycling.

Recognizing that the patents-in-suit are on tenuous patent-eligibility footing, the Amended Complaint attempts to create fact issues where none exist, by alleging that the patent claims incorporate "inventive concepts" including (i) the ability to "select from . . . available live and archived classes" over the Internet (D.I. 16 at ¶¶ 49-52, 61); (ii) track the performance of live and remote users and comparing them at the same point in the class (*id*. at ¶¶ 53, 54); (iii) "synchronizing" archived performance data and live data for comparison "at the same point in the selected cycling class" (*id*. at ¶¶ 55, 62) including via "a start signal indicating a starting point of the cycling class" (*id*. at ¶ 58).

But as discussed above, the specification does not describe any *specific* means for carrying out these functions, let alone new or unconventional ways of doing so.  This is not surprising given Peloton's goal was merely to "re-create" "the same" existing in-studio class experience at home.  (*Id*. at ¶¶ 18, 23, 26).   Nor does the specification contend that Peloton invented new or unconventional methods for creating a leaderboard or comparing competitor performance metrics at the same point in a competition. (*See* § III(B)(3), *supra*).  Those are well-known concepts that have been employed in sporting events for decades, such as cycling and road races (ranking and showing relative times for competitors who started a race at the same starting point), skiing (comparing splits at different points in the race for skiers who started at the same point but at different times), and swimming (ranking and comparing the times of swimmers in different heats at the same points in their respective races).

### D.    <u>Related Litigations and *Inter Partes* Review Proceedings</u>

Peloton has asserted the patents-in-suit against Flywheel Sports, Inc. in Civil Action

Nos. 2:18-cv-390 (in which the '315 patent was asserted) and 2:19-cv-317 (in which the '590 patent was asserted), both of which are pending in the Eastern District of Texas.  In the former case, Magistrate Judge Payne recently recommended that a motion to dismiss challenging the patent eligibility of the '315 patent be denied. Report and Recommendation ("R&R") at 1, *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, No. 2:18-cv-390 (E.D. Tex. Sept. 5, 2019), D.I. 108 (attached hereto as Ex. A).[6]  Flywheel's objections to the R&R are pending.

Flywheel has filed IPR petitions challenging the validity of the '315 patent and three related patents to which it claims priority.  The Patent Trial and Appeal Board instituted IPR proceedings with respect to the three related patents, U.S. Patent Nos. 9,174,805 (IPR2019-00294); 9,233,276 (IPR2019-00295); 9,861,855 (IPR2019-00564), and an institution decision on the '315 patent IPR petition (IPR2019-01411) is expected by mid-February 2020.

## IV.   ARGUMENT

### A.   Legal Standards Governing Echelon's Motion To Dismiss

Patent-ineligibility under § 101 "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion" where there are no relevant factual disputes. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (collecting cases). "[W]here the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute." *Berkheimer v. HP Inc.,*

---

[6] The R&R concluded, based on statements in the specification and Second Amended Complaint that the claimed invention solved availability problems associated with in-studio cycling classes, that "questions of fact remain as to whether the claimed invention ***as a whole*** is directed to well-understood, routine, and conventional activities."  (R&R at 4 (emphasis added)).  But the Federal Circuit has instructed that "the relevant inquiry is not whether the claimed invention ***as a whole*** is unconventional or non-routine," because the step two analysis must focus on "whether the claim limitations other than the invention's use of the ineligible concept" supply an inventive concept. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) (emphasis added).  Thus, the R&R is contrary to law for at least the reason that solving the in-studio cycling unavailability problem by making classes available online is the abstract idea, and "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept." *Id.*

890 F.3d 1369, 1371 (Fed. Cir. 2018) (denial of rehearing *en banc*).

Here, applying the two-step framework set forth in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), the asserted claims are patent ineligible because they (1) are directed to the abstract idea of making competitive exercise classes available online, and (2) recite only admittedly-conventional elements that do not provide an "inventive concept."

### B. The Claims Of The Patents-in-Suit Are Directed To The Abstract Idea Of Making Competitive Exercise Classes Available Online

In this case, one need not *search* for a "brick and mortar" analog to confirm the claims are "directed to" an abstract idea, as the Amended Complaint *admits* the inventors' goal was to "*re-creat[e]*" "*the same* in-studio cycling class experience" at home, by making the classes available online. (D.I. 16 at ¶¶ 18, 26) (emphasis added). The patents-in-suit should be found "directed to" an abstract idea because their "focus" is on the "result" of making competitive exercise classes available online and not any "specific means" for achieving that result. *See Two-Way Media Ltd v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).

### 1. Legal Standards Governing Step One Of The *Alice* Analysis

At *Alice* step one, courts ask whether the claims are, at root, "directed to" an abstract idea. 573 U.S. at 218. "The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* The abstract idea exception applies "to prevent patenting of claims that abstractly cover results where 'it matters not by what process or machinery the result is accomplished.'" *McRo Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016). In analyzing step one, courts consider "whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic process and machinery." *Two-Way Media*, 874 F.3d at 1337. The Federal Circuit has also found it "relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).

While the "directed to" inquiry must focus on the claims, the Federal Circuit has also "found the specification helpful in illuminating what a claim is 'directed to'" insofar as it describes "'the problem facing the inventor' and, ultimately, what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766-67 (Fed. Cir. 2019). Moreover, a specification's failure to disclose "technical details for the tangible components" may suggest those components are "merely 'conduit[s] for the abstract idea.'" *Id*. at 767.

## 2.      The Asserted Claims Are "Directed To" An Abstract Idea

The claims of the patents-in-suit are directed to a quintessential abstract idea:  taking pre-existing exercises classes and making them available online.  Exercise classes are a form of "organizing human activity," an oft-cited category of abstract ideas. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("[W]e we have applied the "abstract idea" exception to encompass inventions pertaining to methods of organizing human activity."); *BSG Tech*, 899 F.3d at 1285 ("[W]e view well-established 'methods of organizing human activity' as abstract.").  Patent claims, such as the present, that take a pre-existing method of organizing human activity and apply it on a computer or over the Internet, have been found directed to an abstract idea in a wide array of fields.  *See, e.g.*, *ChargePoint*, 920 F.3d at 770 (claims "add[ing] networking capabilities to existing charging stations to facilitate various business interactions" invalid under § 101); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (method for screening messages online akin to "corporate mailroom" and "brick-and-mortar post office" invalid under § 101); *Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*, 351 F. Supp. 3d 753, 758–59 (D. Del. 2019), aff'd, No. 2019-1511, 2019 WL 5703890 (Fed. Cir. Nov. 5, 2019) ("Coordinating and monitoring baggage delivery is a well-known method of organizing human activity.").

An inspection of the claim language reveals that "[t]he focus of the asserted claims" is the abstract idea of providing exercises classes over the Internet.  *Elec. Power Grp., LLC v.*

*Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). Stripped of references to generic computer components, representative claim 1 recites the high-level steps of: (i) "displaying [over a network] information about available live and archived exercise classes"; (ii) "receiving a [user's class] selection"; (iii) "outputting . . . the selected exercise class" content; (iv and v) "determining" and "displaying" a user's "performance parameters" (speed, heart rate, etc.); and (vi) "dynamically displaying" and comparing a second user's "performance parameters" "at the same points" in the class. (*See* § III(B)(4), *supra*). The "focus" of these high-level steps is the "result" of providing "live and archived exercise classes" over the Internet, not any specific—let alone a technologically improved—way of doing so.

The specification is also "helpful in illuminating" what the claims are "directed to," *ChargePoint*, 920 F.3d at 767, because it describes the problem to be solved as the "accessibil[ity]" of competitive, in-studio, exercises classes "only at specific times and locations" ('315 patent at 1:59-60)—a human convenience problem and not a technological one. *See Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) (at step one, "it is often helpful to ask whether the claims are directed to 'an improvement in the functioning of a computer,' or merely 'adding conventional computer components to well-known business practices'"); *Broadsoft, Inc., v. CallWave Commc'ns, LLC*, 282 F. Supp. 3d 771, 781 (D. Del. 2017) (finding claims "directed to" an abstract idea where the "'problem' addressed was a human unavailability problem" and not "a problem specific to telephony technology"). The "solution" to the unavailability problem was the abstract idea itself—"providing streaming and on-demand exercise classes" over the Internet ('315 patent at 1:29-31) to offer "***the same***" experience at home (D.I. 16 at ¶ 26, emphasis added).

That the '590 patent claims narrow the abstract idea to "cycling classes" or that the '026 patent claims limit the abstract idea to only "participating in an archived exercise class" does not save them, as "limiting an abstract idea to one field of use" does "not make the concept

patentable." *In re Bilski*, 561 U.S. 593, 612 (2010).

Moreover, contrary to Peloton's allegations in the Amended Complaint (at ¶¶ 60, 67), that certain claims are couched as a "system" or recite "tangible" components "is not enough to save the claim[s] from abstractness." *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) (recitations to "controller," "interface," and "wireless data transmitter" did not save claims). "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *In re TLI Commc'ns*, 823 F.3d at 613. Here, the claims' focus is the abstract idea of making competitive exercise classes available online, and the ancillary recitation of generic components— e.g., a "display screen," "sensors," or "exercise device"—"merely provide a generic environment in which to carry out the abstract idea." *Affinity Labs*, 838 F.3d at 1260.

As discussed above (*see* III(B)(3)), the specification fails to identify any technological problem associated with making live or on-demand exercise classes available online or any specific means for accomplishing the result. The claims here are directed to an abstract idea because they "abstractly cover[] results where it matters not by what process or machinery the result is accomplished," *McRo Inc.,* 837 F.3d at 1312, and are not "directed to an improvement in computer functionality." *Enfish, LLC,* 822 F.3d at 1335.

### C.     The Claims Do Not Include An "Inventive Concept" Such That They Cover Significantly More Than The Abstract Idea Itself

Consistent with the goal of "re-creating" "the same in-studio" competitive exercise class experience at home (D.I. 16 at ¶¶ 18, 26), the patents-in-suit claim the abstract idea at a high level using generic components and techniques that were conventional, routine, and well understood. Thus, the claims lack an "inventive concept" at step two of the *Alice* inquiry.

### 1.     Legal Standards Governing Step Two Of The *Alice* Analysis

At *Alice* step two, courts determine whether the other claim elements, individually or collectively, add "'significantly more'" to the abstract idea—something "'inventive'"—that is

"sufficient to 'transform' the claimed abstract idea into a patent-eligible application." 573 U.S. at 221 (citations omitted).  Several well-settled principles govern this inquiry.

Application of an abstract idea using "conventional and well understood techniques" does not "supply an inventive concept." *BSG Tech.*, 899 F.3d at 1290-91; *see also Baggage Airline*, 351 F. Supp. 3d. at 761 ("reciting generic computer functions and the use of generic computer elements to achieve a more efficient way of 'coordinating and monitoring baggage delivery'" is not an inventive concept).  Similarly, "limiting the use of an abstract idea 'to a particular technological environment,'" *Alice*, 573 U.S. at 223, or "a particular field of information," *SAP Am.*, 898 F.3d at 1169, does not render them patent eligible.

"[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech*, 899 F.3d at 1290. Accordingly, the step-two inquiry must focus on "claim limitations *other than* the invention's use of the ineligible concept," *id.*  (emphasis added), and appending limitations that are themselves abstract does not supply an "inventive concept."  *See SAP Am.*, 898 F.3d at 1168.  "What is needed is an inventive concept in the non-abstract application realm."  *Id.; see also Baggage Airline*, 351 F. Supp. 3d at 761-62 (additional limitations requiring "selection to hold delivery" "are themselves abstract . . . and cannot satisfy the requirement of an 'inventive concept'").

Finally, claiming a result, rather than a concrete way to achieve the result, does not supply an "inventive concept."  "[T]he essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101." *Elec. Power*, 830 F.3d at 1356; *see also Affinity Labs*, 838 F.3d at 1265 (ineligible claims "effectively cover any wireless delivery of out-of-region broadcasting content to a cellular telephone via a network"). A "critical difference" exists between "patenting a particular concrete solution to a problem" and "attempting to patent the abstract idea of a solution to the problem in general," because the

overbroad functional claiming of the latter "purport[s] to monopolize every potential solution to the problem." *Elec. Power*, 830 F.3d at 1356.

### 2.    The Asserted Claims Do Not Contain An "Inventive Concept"

Representative claim 1 of the '315 patent involves the following six functional steps: (i) "displaying [over a network] information about available live and archived exercises"; (ii) "receiving [a user's] class selection"; (iii) "outputting . . . the selected exercise class" content; (iv and v) "determining" and "displaying" a user's "performance parameters" (speed, heart rate, etc.); and (vi) "dynamically displaying" and comparing a second user's "performance parameters" "at the same points" in the class.  (*See* § III(B)(4), *supra*).  The other independent claims do not materially differ, as evidenced by the Amended Complaint, which does not identify any distinctions effecting their eligibility. (*See* D.I. 16 at ¶¶ 49-55 (same inventive concepts alleged for the independent claims of the '315 and '590 patents) and ¶¶ 55, 62 (alleging independent claims have the inventive concept of "time-shift[ing]" or "synchronizing" past performance data for comparison with the user's performance data)).

An inventive concept requires something "significantly more" than the abstract idea itself.  Here, representative claim 1 features fall into two categories: (i) those admittedly embodied in existing in-studio cycling classes, and/or (ii) those that cover the abstract idea of making the classes available online.  Neither category supplies an "inventive concept," because the former is admittedly "conventional," and the latter does not involve "limitations other than the invention's use of the ineligible concept." *BSG Tech*, 899 F.3d at 1290.

As the admitted goal of the patents-in-suit was "re-creating the . . . competitive in-studio cycling experience at home" (D.I. 16 at ¶ 18), it cannot be disputed that the claim elements associated with "competitive in-studio cycling" classes, like those offered by Flywheel, were conventional.  Indeed, Peloton admits that existing in-studio cycling classes

allowed a rider to "see his or her performance compared [e.g. on a leaderboard] . . . against riders in the same class at the same time." (*Id.* at ¶ 19).

Peloton further alleges the claimed invention improves the in-studio experience by enabling riders to compete "at home on their own schedule" "against hundreds (for a live class) or even thousands (for an on-demand class)." (D.I. 16 at ¶¶ 18-19).  But these alleged benefits flow from the abstract idea itself, and "use of the ineligible concept . . . cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech*, 899 F.3d at 1290.

Further, the result is not changed even if the claims implicitly or explicitly require live and archived performance data be "synchronized" (e.g., by using a start signal) so that data can be compared at the same point in time in a class.[7]  The specification does not purport to describe any technical challenges or new solutions to problems associated with time-synchronization and none are embodied in the claims.  *See supra* § III(B)(3).  This is fatal to Peloton's contention that time synchronizing two pieces of data is an inventive concept.  *Electric Power*, 830 F.3d at 1355 ("the use of "off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" is not an inventive concept).  Indeed, on nearly identical facts, the Federal Circuit held that the use of off-the-shelf conventional technology for "'displaying concurrent visualization' of two or more types of information, ***even if understood to require time-synchronized display***" is not an inventive concept.  *Id.* (emphasis added); *see also Ameranth, Inc. v. Domino's Pizza, LLC,* 2019 WL 5681315, at *6 (Fed. Cir. Nov. 1, 2019) ("real-time synchronization" feature implemented using convention steps is not an inventive concept).

---

[7] *See* D.I. 16 at ¶ 55 (alleging that the independent claims of the '315 and '590 patents implicitly require archived performance data be "time-shifted" for comparison with "the user's own performance parameters") and '026 patent, claims 1 and 11 (explicitly requiring archived performance data be synchronized for comparison with the "first user performance" data).

Finally, while the Amended Complaint attempts to bolster the eligibility argument by painting a story of "a long, iterative process to develop a successful hardware-software integration" (D.I. 16 at ¶ 33), the specification fails to describe either *any* technical challenges faced by the inventors or *any* particular way of making exercise classes available online.  Even more problematic, "[t]o save a patent at step two, an inventive concept must be evident in the claims," *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017), and the claims here do not cover any "unique hardware-software."  In short, Peloton could have sought to describe and claim its "successful hardware-software integration" but chose instead to claim broadly the abstract idea of making competitive exercise classes available online.

The *ChargePoint* decision is instructive.  There, the patentee sought to address shortcomings associated with car charging stations by adding network connectivity.   This connectivity "allow[ed] the stations to be managed from a central location, allow[ed] drivers to locate charging stations in advance, and allow[ed] all users to interact intelligently with the electricity grid." 920 F.3d at 763.  ChargePoint alleged that it was first to conceive of the idea and did so "in the face of widespread industry skepticism." *Id.*  But like here, "the specification gives no indication that the patented invention involved how to add network connectivity to these charging stations in an unconventional way." *Id.* at 775.  Accordingly, the Federal Circuit found that "the only possible inventive concept . . . is the abstract idea itself." *Id.*

The same result applies here.  The six steps of claim 1 of the '315 patent do no more than take the conventional features that were available in-studio and make them available online using routine and conventional techniques.

### 3.   The Amended Complaint Does Not Plausibly Allege The Claims Recite An "Inventive Concept."

Recognizing that the patents-in-suit themselves do not identify any patent-eligible subject matter as novel or inventive, the Amended Complaint identifies a laundry list of alleged "inventive concepts" (D.I. 16 at ¶¶ 48-67) that Peloton will presumably argue create a fact issue

at step two of the analysis. These conclusory allegations contradict the clear intrinsic record and cannot overcome Peloton's admission that its invention was "re-creating" existing in-studio cycling classes at home.

First, the Amended Complaint remarkably alleges that providing both live and archived classes was "a significant advance[] over the prior art" because it allowed the home user to decide whether "to start [an archived] workout at the instant he or she wants" or "to participate live with other class participants." (D.I. 16 at ¶¶ 51-52, 60). But these allegations do not plausibly allege an "inventive concept," as the ability to play live or recorded video was a routine technology at the time of the alleged invention that had long been available via televisions coupled with VCRs, DVRs, or TIVO. Moreover, even if providing live or archived content was non-conventional (it is not), neither the claims nor specification disclose "any specific or concrete way" of providing live or archived content. *Affinity Labs*, 838 F.3d at 1258. Instead, the disclosure regarding video creation and distribution in the patents is described as "exemplary only" and "that the present invention can be implemented through a variety of different system architectures . . . ." ('315 patent at 11:12-21.) Finally, it does not matter whether providing "information about . . . archived classes" was new because the limitation is itself an abstract idea, and "a claim for [an allegedly] *new* abstract idea is still an abstract idea." *Synopsys*, 839 F.3d at 1151.

Next, the Complaint alleges that conventional home bikes did not have "networked access" to live and archived cycling classes (D.I. 16 at ¶¶ 50, 61). But making exercise classes available online (by adding networking capabilities to existing bikes) "is the abstract idea itself," and "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *ChargePoint*, 920 F.3d at 774 ("[T]he alleged 'inventive concept' . . . is that the charging stations are network-controlled. But network control is the abstract idea itself . . . .").

The Complaint also identifies as alleged "inventive concepts" tracking and comparing multiple users' performance parameters (D.I. 16 at ¶¶ 53-54), including with respect to multiple remote users participating in an archived class (*Id.* at ¶ 64), and displaying them on leaderboards during live and/or archived classes (*Id.* at ¶¶ 56, 57, 65). But these allegations do not plausibly allege an "inventive concept," as collecting, comparing and displaying performance parameters on leaderboards were conventional features of the in-studio classes Peloton sought to "re-create." (*Id.* at ¶¶ 18, 19). In addition, neither the claims nor specification disclose "any specific or concrete way" of making this functionality available for users taking archived classes. *Affinity Labs*, 838 F.3d at 1258. At best, making conventional leaderboard technology available for archived, online classes is itself an abstract idea, and "a claim for [an allegedly] *new* abstract idea is still an abstract idea." *Synopsys*, 839 F.3d at 1151.

Still further, the Complaint alleges that certain dependent claims of the '026 patent include an inventive concept because they "describe particular types of information to be displayed." (D.I. 16 at ¶ 66). But "limitation of the claims to a particular field of information" (e.g., heartrate) cannot supply an inventive concept. *SAP Am.*, 898 F.3d at 1169.

Finally, the Amended Complaint makes the remarkable contention that "time synchronization" using a "start signal," which serves as the synchronization point for data comparison, is an "inventive concept" of certain dependent claims. (D.I. 16 at ¶ 58).[8] From pistols to flags and horns to buzzers, "start signals" have taken many forms over the years, but they always served one purpose—to "synchronize" the start of the event. As anyone who has watched the Olympics on TV can attest to, time-synchronizing live and archived performance data is routine in sporting events like swimming and downhill ski races, where the present

---

[8] The Amended Complaint also alleges that certain "time-shifting"/synchronization features in independent claims (which do not reference a "start signal") are inventive concepts. (D.I. 16 at ¶ 55, 62). These generic "time-shifting"/synchronization features are not inventive concepts for reasons explained in the prior section. *See* § IV(C)(3), *supra*.

racer's times are compared with a prior racer's times (typically the leader's) at the same points in the course. Notably, neither the claims nor the specification purport to describe any technical challenges or new solutions to problems associated with time-synchronization. *See Broadsoft*, 282 F. Supp. 3d at 783 ("If this conversion constituted an inventive concept, one would expect a lengthier discussion in the patent of how to accomplish it. The lack of discussion of this conversion process shows that it was a routine process known to those of skill in the art at the time of the invention."). Equally important, the claims fail to disclose "any specific or concrete way" to synchronize live and archived data, aside from the use of conventional "start" and "stop" signals. *Affinity Labs*, 838 F.3d at 1258.

### 4. The Remaining Dependent Claims Do Not Include An "Inventive Concept."

Tellingly, Peloton does not allege any additional dependent claims include inventive concepts beyond those discussed above. Nor could it, as the remaining dependent claims add undisputedly routine and conventional elements. (*See*, *e.g.*, '590 patent, claims 2-4 (adding conventional cycling elements such as "a first stationary cycle" and "a pair of pedals"); '590 patent, claims 5-8, '315 patent, claims 3 & 4, and '026 patent, claim 7 (adding routine display elements and features such as limiting the "user interface" to a "mobile device," displaying "performance parameters" in a "secondary window," allowing "selectable content for display," and outputting the display "substantially in real-time"); '590 patent, claims 9-10, 14 & 19, '315 patent, claims 5 & 9, and '026 patent, claim 6  (adding conventional hardware components such as a "server," "communication components," "hardware processor," and "a memory storing instructions"); and '590 patent, claim 13, '315 patent, claim 10, and '026 patent, claim 20 (adding conventional "video chat" features)).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should find the claims of the patents-in-suit invalid under 35 U.S.C. § 101 and dismiss Counts I - III of the Amended Complaint with prejudice.

Respectfully submitted,

GREENBERG TRAURIG, LLP

OF COUNSEL:

*/s/ Benjamin J. Schladweiler*
Douglas R. Weider                       Benjamin J. Schladweiler (#4601)
James L. Ryerson                        The Nemours Building
GREENBERG TRAURIG, LLP                  1007 North Orange Street, Suite 1200
500 Campus Drive, Suite 400             Wilmington, DE  19801
Florham Park, NJ 07932                  Phone:  (302) 661-7000
Phone:  (973) 360-7900                  schlwadweilerb@gtlaw.com
weiderd@gtlaw.com
ryersonj@gtlaw.com                      *Attorney for Defendant Echelon Fitness, LLC*

Dated:  January 17, 2020

21