# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PELOTON INTERACTIVE, INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| | ) C.A. No. 19-cv-1903-RGA |
| v. | )<br>) |
| | ) (Consolidated) |
| ECHELON FITNESS MULTIMEDIA LLC;<br>ECHELON FITNESS, LLC; ECHELON<br>STUDIO, LLC; VIATEK CONSUMER<br>PRODUCTS GROUP, INC., | )<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>) |
| Defendants. | )<br>) |

### LETTER TO THE HONORABLE RICHARD G. ANDREWS
### FROM BENJAMIN J. SCHLADWEILER, ESQ. CONCERNING
### RESPONSE TO PELOTON'S MOTION TO COMPEL

OF COUNSEL:

David Jay
Douglas R. Weider
James L. Ryerson
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Phone: (973) 360-7900
jayd@gtlaw.com
weiderd@gtlaw.com
ryersonj@gtlaw.com

Tiffany A. Blofield
GREENBERG TRAURIG, LLP
90 South 7th Street, Suite 3500
Minneapolis, MN 55402
Phone: (612) 259-9700
blofieldt@gtlaw.com

Dated: January 14, 2022

GREENBERG TRAURIG, LLP

Benjamin J. Schladweiler (#4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 661-7000
schlwadweilerb@gtlaw.com

*Attorneys for Defendant Echelon Fitness Multimedia, LLC*

Dear Judge Andrews:

**Peloton's Request for All Documents Produced in UK Litigation (RFP 306)**

Peloton seeks to compel Echelon to produce documents "***responsive to Plaintiff's Request for Production No. 306***" (D.I. 250, proposed order ¶1), which asks for **all** documents Echelon produced to Peloton in a different case pending in a different country involving different claims and governed by different discovery standards:

> **REQUEST FOR PRODUCTION NO 306:**
>
> All DOCUMENTS produced by YOU in the litigation filed by PELOTON, Peloton Interactive UK Limited, and Peloton Interactive Deutschland GmbH against Echelon Fitness, Echelon Multimedia, Viatek, and Echelon Fitness UK Limited in the United Kingdom, Case No. IL-2020-000074, currently pending before the High Court of Justice.

Yet Peloton does not explain, with any specificity, the relevance of obtaining **all** documents from that other case. Peloton served 377 document requests in this case, seeking every possible relevant document and much more. Those requests have been assessed and answered based on the claims asserted in this case in accordance with the rules of this Court.

Indeed, the UK case does not involve claims against the "same trademarks and trade dress," but rather claims of ***copyright*** and trademark infringement under foreign law involving different logos, registered marks, accusations, rights, and standards. (**Ex. A**). The UK case also involves numerous different custodians, different search terms, different corporate entities (e.g., Echelon Fitness UK Limited, Peloton Interactive UK Limited, and Peloton Deutschland, GmbH), searches of different media, and different production schedules.

The obvious conclusion is that Peloton is trying to end run this Court's rules and relevance standards, or just seeking to impose additional burden. If the discovery sought was "highly relevant" as Peloton claims, then Peloton could have (and likely did) already serve requests here specifically targeting the information it allegedly needs.

Peloton's request is also nothing like Echelon's request for Flywheel documents. First, Echelon was not a party to the Flywheel case like Peloton is in both the US and UK cases against Echelon. Second, Echelon clearly established specific relevance of particular documents sought from the Flywheel case, which Peloton has not even attempted here. Further, Peloton only produced the Flywheel agreement, some deposition transcripts and exhibits, and written discovery responses on certain issues, with a request for additional settlement and due diligence materials outstanding. Indeed, Peloton vehemently objected to producing any Flywheel production documents here, arguing that Echelon's requests were improper "piggyback requests." (**Ex. B**, RFPs 22 and 26); *Racing Optics v. Aevoe Corp*, 2016 WL 4059358, at *1 (D. Nev. July 28, 2016) ("'Piggyback' discovery requests are prohibited. [Plaintiff] must specifically ask for the documents he wants and be able to demonstrate that the information he seeks is relevant to his claims in this case. The fact that [Defendant] produced certain documents in the [other] cases does not necessarily make them discoverable in this case.").

Finally, Echelon has only produced initial disclosure documents in the UK to date, with the parties' main productions not due until May 20, 2022, well after fact discovery closes here.  (**Ex. C**).  As a compromise, Echelon is willing to produce the handful of UK initial disclosure documents that have been produced, but imposing any ongoing obligation to blindly share future productions from the UK case without any opportunity for assessment of the relevance to the claims in this case would be both burdensome and highly illogical.  Indeed, if Peloton desires something else in discovery here, it should serve RFPs specifically requesting it, just as it did yesterday (D.I. 252).

**Peloton's Request for Marketing Materials Relating to Unclean Hands**
After lengthy negotiations over custodians and search terms, Echelon produced a multitude of advertisements and other information relating to Peloton's false advertising claims and its purported unclean hands defense.  But Peloton wants more – "*[a]ny* ads advertising a specific price for Echelon's bikes" – purportedly to show that Echelon had unclean hands.  (**Ex. D** at 3). Peloton's expansive demands fly in the face of Federal Rule of Civil Procedure 26 which limits discovery based on relevance and proportionality to the needs of a case.

On September 30, 2021, Peloton sent Echelon a twelve-page document containing a slew of allegedly representative ads (that it found in the public domain) and made vague demands that Echelon search for and produce all allegedly similar ads (**Ex. D**).  In subsequent negotiations, Peloton was unable to provide specific parameters regarding what exactly it was looking for or how Echelon should conduct a search, other than to claim it needs all ads containing any price point, which would put an enormous burden on Echelon.

Moreover, these documents are not relevant.  In its proposed order, Peloton seeks all documents "related to their advertisements offering Echelon products separately from a subscription to Echelon content."  But as Echelon explained on multiple occasions, Echelon does not advertise its products separately from its subscription.  Indeed, all of Echelon's ads cited by Peloton, regardless of the monthly price point, include a subscription to Echelon's United membership.  (*See* D.I. 250, Exs. 3, 4, 5, 6).  Peloton's accused ad attached to its letter is completely different, as Peloton's advertised $58/mo. price only includes the price of the bike and not the required price of the subscription – and it fails to disclose to the consumer that the subscription is ***required***.  (*See id*., Ex. 2).[1]

Despite this lack of relevance, Echelon has already produced many ads that contain a price point, and (obviously) Peloton has found many others on its own.  Group 8A, a third party who acted as Echelon's marketing arm for much of Echelon's existence, produced hundreds of additional documents (including advertisements) in response to Peloton's subpoena.

In sum, any minimal relevance of producing additional advertisements that have either not been produced already or Peloton cannot already find publicly, would be outweighed by the heavy burden Echelon would face in searching for and producing ***all*** pricings ads with zero limitations or parameters.  Thus, Peloton's continued insistence on obtaining more advertisements is not proportional to the needs of the case.

---

[1] Unlike Peloton's bike, which is essentially useless without the Peloton All Access Membership, Echelon's EX3 bike is used with a consumer's own device, and thus can use content from other sources (including Peloton's App) during or after the Echelon United subscription expires.

**Peloton's Requests for GT+ Bikes**
Peloton's request to compel Echelon to respond to ten overbroad document requests concerning a line of bikes (the GT+ bikes) that admittedly "do[] not infringe Peloton's trade dress rights" should be denied.  During the parties' negotiations, Peloton asserted that Echelon's decision to stop selling the EX-3 bike in favor of the newer GT+ bike was relevant to Peloton's claim that Echelon had engaged in willful infringement.  (**Ex. E**).  But after Echelon responded that a design change cannot be used to demonstrate culpability with respect to the old design (id.), Peloton concocted its present theory: that extensive discovery relating to Echelon's design of non-accused product features is relevant because it will show "different colors and fonts" are available and therefore Peloton's purported trade dress is not functional. (D.I. 250 at 3).

Peloton's new argument is misplaced.  "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995).  Here, Peloton broadly asserts common law trade dress rights in the "look and feel of the Peloton Bike." (D.I. 77, ¶84).  While many aspects of the Peloton Bike and its graphical user interface are functional—indeed, Peloton claims they are covered by its patents—Echelon does not contend that the ubiquitous black/red/white color scheme or the generic, all caps font are functional.  If Peloton needs evidence of alternative designs, it need look no further than the dozens of bikes actually sold by Echelon and other competitors that utilize different designs, color schemes, or fonts.  (**Ex. F**).

Even if any alternate bike/logo designs Echelon considered were relevant to functionality[2], that still would not justify Peloton's ten facially-overbroad requests, which cover subject matter Peloton has not even attempted to argue is relevant, such as "[a]ll" documents concerning:
- Echelon's "testing, manufacturing, sale and marketing" of the GT+ Bikes (No. 307);
- Echelon's "clearance" of the GT+ Bike design (No. 309);
- Echelon's decision to stop marketing the EX-3 Bike (No. 312);
- Echelon's alleged "decision to phase out the EX-3" in favor of the GT+ Bike (No. 313);
- Echelon's "decision . . . to introduce the GT+ Connect Bike" (No. 314);
- "[B]usiness, strategic, financial, or marketing plans, forecasts, analyses, or reports that relate to the GT+ Connect Bike" (No. 315); and
- "[T]he graphical user interface for the GT+ Connect Bike" (No. 316).

(D.I. 250-1 at Ex. 1, Request Nos. 306-317).  These Requests having nothing to do with the existence of alternative designs, and instead stem from Peloton's misguided belief that it could use what it believed to be a design around as evidence of culpability.

---

[2] Peloton's argument that "[t]he existence of alternative designs is central to the issue of functionality" is not supported by the Third Circuit decision it cites.  If a product feature has utilitarian functionality, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001).

The Honorable Richard G. Andrews
January 14, 2022
Page 4

                                  Respectfully,

                                  Benjamin J. Schladweiler (#4601)

cc: All Counsel of Record