```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4    PELOTON INTERACTIVE, INC.,      )
                                      )
 5                   Plaintiff,       )
                                      ) C.A. No. 19-1903-RGA
 6    v.                              )
                                      )
 7    ECHELON FITNESS, LLC,           )
                                      )
 8                   Defendant.       )

 9
                                      J. Caleb Boggs Courthouse
10                                    844 North King Street
                                      Wilmington, Delaware
11
                                      Monday, January 24, 2022
12                                    11:02 a.m.
                                      Discovery Dispute Conference
13

14    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15    APPEARANCES:

16              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  MICHAEL J. FLYNN, ESQUIRE
17              BY:  ANTHONY D. RAUCCI, ESQUIRE

18                        -and-

19              LATHAM & WATKINS, LLP
                BY:  JESSICA L. SABA, ESQUIRE
20              BY:  STEVEN N. FELDMAN, ESQUIRE
                BY:  MARC N. ZUBICK, ESQUIRE
21              BY:  ANDREW GASS, ESQUIRE
                BY:  MATTHEW S. SALERNO, ESQUIRE
22              BY:  JOSEPH C. AKALSKI, ESQUIRE

23                             For the Plaintiff

24

25
```

```
 1   APPEARANCES CONTINUED:

 2               GREENBERG TRAURIG LLP
               BY:  BENJAMIN SCHLADWEILER, ESQUIRE
 3             BY:  JAMIE RYERSON, ESQUIRE
               BY:  DAVID JAY, ESQUIRE
 4             BY:  DOUGLAS R. WEIDER, ESQUIRE

 5                              For the Defendant

 6
                     ***   PROCEEDINGS   ***
 7

 8               THE COURT:  Good morning.  Mr. Flynn, if you can

 9   hear me, nod your head.

10               (Whereupon Mr. Flynn nodded his head.)

11               THE COURT:  All right.  So, is my deputy clerk

12   on the line?

13               DEPUTY CLERK:  Yes, Judge.

14               THE COURT:  And my court reporter?

15               THE REPORTER:  Yes, Judge.

16               THE COURT:  All right.  Hold on just one second.

17               All right.  So, this is the discovery matter in

18   Peloton vs. Echelon, Civil Action Number 19-1903.

19               I do see Mr. Flynn and Mr. Schladweiler, but I

20   forget who represents who.  So, why don't we start with the

21   Plaintiff Peloton.

22               MR. FLYNN:  Good morning, Your Honor.  Michael

23   Flynn from Morris Nichols.  I'm joined today by Anthony

24   Raucci from our office.  With me from Latham for Peloton,

25   Steve Feldman, Marc Zubick, Jessica Saba, Andrew Gass.  Matt
```

11:03:02 1  Salerno and Joseph Akalski.  And Ms. Saba will be handling

11:03:05 2  argument on the discovery issues.

11:03:07 3          THE COURT:  All right.  Well, good morning,

11:03:10 4  Ms. Saba.

11:03:10 5          And for Echelon, Mr. Schladweiler?

11:03:14 6          MR. SCHLADWEILER:  Good morning, Your Honor.

11:03:15 7  Ben Schladweiler from Greenberg Traurig on behalf of

11:03:20 8  Echelon.  I'm joined today by David Jay, Jamie Ryerson and

11:03:25 9  Doug Weider from our New Jersey office.

11:03:28 10         THE COURT:  And who's going to be speaking for

11:03:30 11  your side?

11:03:31 12         MR. SCHLADWEILER:  I think it will be a

11:03:32 13  combination, Your Honor, of myself, Mr. Jay and Mr. Ryerson,

11:03:39 14  depending on what the issue is.

11:03:42 15         THE COURT:  Okay.  All right.  So, I have read

11:03:45 16  all the letters and I have spent some time thinking about

11:03:50 17  the issues that you have raised.  And I don't think we're

11:03:56 18  going to need to argue all of them, but one thing I am

11:03:59 19  curious about is essentially most of the Peloton response to

11:04:04 20  the Echelon letter was, We're going to produce these

11:04:09 21  documents after the date of this letter, but before the

11:04:12 22  hearing.

11:04:15 23         And so, I was wondering if that happened and

11:04:20 24  what Echelon thinks about how much, if Echelon has had a

11:04:27 25  chance to review these documents, how that affects your

11:04:32 1  disputes.  And so, that would presumably be somebody on

11:04:37 2  Mr. Schladweiler's side who's going to speak.

11:04:40 3         MR. SCHLADWEILER:  And I can start, Your Honor.

11:04:42 4  We have looked at the production.  I don't think that the

11:04:45 5  production has really resolved anything of substance,

11:04:49 6  unfortunately.

11:04:50 7         THE COURT:  Well, so when did you get the

11:04:52 8  production, roughly?

11:04:54 9         MR. SCHLADWEILER:  We had a production some time

11:04:59 10  this week.  I should say last week.  I don't remember

11:05:06 11  exactly, but it might have -- I think it might have been

11:05:09 12  Thursday or Friday.

11:05:10 13         THE COURT:  And how big of a production was it?

11:05:13 14         MR. SCHLADWEILER:  It was a couple hundred

11:05:19 15  pages, if I remember correctly.  There were some documents

11:05:24 16  on the -- there were some cross-use documents, and there's

11:05:30 17  some documents that are only used in our case.  The

11:05:32 18  cross-used documents are used in both this case and the ICON

11:05:35 19  case.

11:05:36 20         The ones that were produced in the cross-use

11:05:41 21  portion of this for the ICON case, I think they were

11:05:43 22  essentially -- most of it looked like documents from 2012 to

11:05:49 23  2013, not anything that we were really -- you know, that is

11:05:54 24  a dispute today.  And then there were a handful of

11:05:58 25  documents, I believe, that were produced pursuant to a

11:06:02 1   search of a different custodial and firm-related issues.

11:06:05 2   Again, that's not really at issue today.

11:06:09 3           THE COURT:  All right.  Okay.  So, basically

11:06:23 4   Echelon wanted Flywheel documents which include

11:06:29 5   correspondence between Peloton's counsel, on the one hand,

11:06:32 6   and Flywheel's counsel on the other hand relating to the

11:06:36 7   Flywheel settlement and the Flywheel declaration.

11:06:39 8           I'm going to grant that request.  It's limited

11:06:44 9   to outgoing and incoming communications with the counsel for

11:06:50 10  the other side, so it shouldn't raise a lot of privilege

11:06:53 11  issues.

11:06:55 12          MR. SABA:  Your Honor --

11:06:56 13          THE COURT:  And I think it seems to be very

11:06:58 14  relevant to the issues that Echelon keeps raising about, you

11:07:06 15  know, the nature of the Flywheel settlement and the Flywheel

11:07:09 16  documents.

11:07:10 17          I'm also going to order that the term sheets and

11:07:13 18  drafts of the Peloton Flywheel agreements be produced, that

11:07:18 19  the due diligence concerning Peloton's acquisition of the

11:07:23 20  Flywheel at-home bike business, including a list of assets

11:07:27 21  and evaluations by Peloton or its bankers be produced.  And

11:07:31 22  that the documents relating to the preparation and filing of

11:07:37 23  the Flywheel declaration be produced.

11:07:40 24          I'm not going to order the documents relating to

11:07:43 25  the dismissal of the Flywheel infringement claims and the

11:07:47 1    Flywheel IPR proceedings be produced.  Among other things, I

11:07:50 2    think that's just too vague of a request.

11:07:52 3              So, that resolved the first.

11:07:56 4              MS. SABA:  Your Honor --

11:07:58 5              THE COURT:  No.

11:07:59 6              MS. SABA:  -- I don't mean to interrupt.

11:08:01 7              THE COURT:  Actually, though, I do have a

11:08:02 8    question.  How long will it take to produce these documents?

11:08:05 9              MS. SABA:  So, I first want to clarify that we

11:08:08 10   did produce these documents last week.  I'm not sure what

11:08:11 11   Mr. Schladweiler is talking about about how most documents

11:08:13 12   are from 2012 and 2013.  Not only have we produced

11:08:18 13   communications between Peloton's ten original custodians

11:08:22 14   related to the settlement agreement, this past week we

11:08:25 15   reviewed two additional custodial documents from M&A

11:08:29 16   employees at Peloton related to diligence.  We have already

11:08:32 17   produced documents that are outgoing from counsel, to the

11:08:35 18   extent that they were forwarded on to Peloton custodians.

11:08:38 19   We produced them in redacted form or we've logged them at

11:08:42 20   this point.

11:08:43 21             It's my understanding that the only additional

11:08:45 22   discovery relevant to these requests that hasn't been

11:08:48 23   provided is emails that are either from outside counsel's

11:08:52 24   law firm, which is no longer involved in this litigation, or

11:08:55 25   in-house counsel at Peloton.  I am not sure what

11:09:00  1    Mr. Schladweiler is talking about about other deficiencies.

11:09:03  2              THE COURT:  All right.  Well, Ms. Saba, I say

11:09:06  3    this without prejudice to the question of whether or not

11:09:11  4    you've already produced these, but given that the basic

11:09:15  5    Peloton playbook, as I can see it, is not to produce stuff

11:09:20  6    until it's threatened to come to me and then to produce it

11:09:23  7    immediately before, I want the Order to be in place telling

11:09:27  8    you to do this.

11:09:29  9              And, also, as you've noted, you will need to get

11:09:35 10    up with Peloton's former counsel, even if they don't

11:09:40 11    represent Peloton anymore.  But your statement that you've

11:09:46 12    produced most of this is noted.

11:09:47 13              All right.  So, going on to the price drop in

11:09:51 14    2021.  Hold on a minute.  Hold on a minute.

11:10:39 15              THE COURT:  All right.  So, the price drop.  At

11:10:41 16    the time when these letters were submitted, I think Peloton

11:10:44 17    said it was reviewing 1,747 emails that were supposedly

11:10:49 18    relevant to this.  Is that something that Peloton completed

11:10:53 19    and decided what to do about?

11:10:57 20              MS. SABA:  Yes, Your Honor.

11:10:58 21              THE COURT:  And so, out of the 1,747 documents

11:11:02 22    or emails, how many did you actually produce?

11:11:06 23              MS. SABA:  Your Honor, I don't have the exact

11:11:10 24    number on how many of our production documents were --

11:11:13 25              THE COURT:  I'll accept your good-faith

11:11:16 1   estimate.

11:11:16 2           MS. SABA:  Oh, gosh.  Maybe around a hundred.

11:11:20 3   That's really an estimate on my part.  I don't -- that would

11:11:25 4   be my guess, though.

11:11:26 5           THE COURT:  All right.  And so, in any event,

11:11:32 6   I'm going to accept your production from the emails as being

11:11:39 7   sufficient based on the fact that you generated those

11:11:47 8   documents and you reviewed them.

11:11:49 9           But there are two things that which are kind of

11:11:52 10  related which, to the extent that your email search didn't

11:11:57 11  pick them up, that I think you ought to -- that I'm going to

11:12:01 12  order that you produce.  And that would be any Board minutes

11:12:05 13  and presentations to the Board relating to the price drop.

11:12:11 14          Do you know, Ms. Saba, whether that was picked

11:12:13 15  up in what you've already done?

11:12:14 16          MS. SABA:  It was.  It would have been.  And we

11:12:18 17  produced Board meeting minutes detailing the most recent

11:12:21 18  price drop.

11:12:22 19          THE COURT:  And presentations to the Board about

11:12:24 20  why that was a good idea?

11:12:25 21          MS. SABA:  Correct.  There was one presentation

11:12:27 22  included in the production which was financial updates

11:12:29 23  through the quarter and had a separate presentation on the

11:12:31 24  reasons behind the recent price drop.

11:12:34 25          THE COURT:  All right.  Well, in any event, the

11:12:36 1    record that I'm going to issue is going to tell you to

11:12:38 2    produce that.  But based on what you've said, I think the

11:12:45 3    part about the price drop, you know, I don't think it's

11:12:52 4    going to require you to do anything further.

11:12:55 5           So, let's go on to the Zendesk customer records.

11:12:59 6    So, I'm somewhat puzzled, as perhaps Echelon is.  And, of

11:13:08 7    course, Ms. Saba, if you've solved this problem, then I

11:13:12 8    guess that's one thing.

11:13:14 9           But as I understand it, somebody at Peloton, the

11:13:21 10   Senior Vice President of Member Experience seemed to be

11:13:25 11   getting pretty specific information from somewhere, and I

11:13:28 12   assume that's Zendesk, that during this two-week period

11:13:34 13   there were 20 tickets one week and 25 tickets the other on

11:13:38 14   this topic.

11:13:39 15          And so, have you done anything more to see

11:13:45 16   whether, besides for the four records you've produced, what

11:13:50 17   the story is or would be on the other 41 records?

11:13:54 18                  MS. SABA:  We have, yes.  So --

11:13:55 19                  THE COURT:  What have you found out?

11:13:58 20                  MS. SABA:  So, we did a review of the key term

11:14:01 21   search that we used to find these agreements.  And as Mr. --

11:14:06 22   I guess, I don't know who had the motion, but in Echelon's

11:14:09 23   motion, they said, We produced additional documents.  We've

11:14:12 24   also looked specifically at that email.

11:14:14 25                  So, as you note, it was an email between the

11:14:17  1    member -- the VP of Consumer Experience to another person at

11:14:20  2    Peloton.  They were discussing specific Zendesk records in

11:14:24  3    that email.  And we were trying to look into what exact

11:14:29  4    Zendesk ticket they were referring to, and if we could

11:14:32  5    somehow figure out what they were.

11:14:33  6            This past week we produced correspondence that

11:14:35  7    we found that indicated that those 45 tickets were not

11:14:38  8    actually not all related to the consumer confusion issue

11:14:42  9    that Echelon sought discovery on.  And there's a

11:14:48 10    contemporaneous email that we just produced last week that

11:14:50 11    said out of a random sample of 12 of those 45 emails, only

11:14:53 12    two were related to the consumer confusion point that

11:14:58 13    Mr. Schladweiler is moving on.  So, we think our search

11:15:00 14    terms are more than adequate.

11:15:02 15            We asked Echelon's counsel to propose any

11:15:05 16    additional search terms that they thought we should run over

11:15:08 17    that targeted period.  They came back with search terms that

11:15:12 18    yielded more than 5 million hits over a time period that was

11:15:15 19    not limited to the two weeks.

11:15:17 20            So, we believe that we've done more than an

11:15:20 21    adequate investigation on these, and I'm happy to answer any

11:15:24 22    additional questions about that.

11:15:25 23            THE COURT:  Well, so thank you, Ms. Saba.  So,

11:15:32 24    45 tickets, that's pretty precise.  And you may have already

11:15:36 25    said the answer, but I lost track.  You know, you were

11:15:42  1    talking about what seemed to me, what I was thinking was a

11:15:46  2    logical thing to do.  And you may have done it better than I

11:15:49  3    was thinking about it, but that before the Senior Vice

11:15:54  4    President was talking about these tickets, you would think

11:15:57  5    that there was someplace where he got this information from,

11:16:01  6    and presumably you were trying to run that down.

11:16:05  7             So, are you saying that whatever -- so, of the

11:16:12  8    45 tickets, whatever they may be that he was referring to,

11:16:17  9    did you identify more than the four you had identified

11:16:19 10    before?

11:16:20 11             MS. SABA:  So, I think it would be helpful to

11:16:23 12    back up and talk about how Zendesk works.  It's a

11:16:26 13    third-party system that essentially gets every single

11:16:30 14    consumer feedback or consumer question related at Peloton.

11:16:34 15    There's tens of thousands of these each week.  Both parties

11:16:37 16    agreed to use search terms to identify those materials.  We

11:16:41 17    ran searches, reviewed 13,000 documents related to this

11:16:45 18    issue.

11:16:45 19             After that production happened, counsel for

11:16:48 20    Echelon identified this email that we're talking about now.

11:16:51 21    We looked at all of the chains in that email.  We tried to

11:16:54 22    figure out what those tickets were.  The emails that were

11:16:58 23    listed in that as consumer complaints in that email we've

11:17:01 24    produced.

11:17:02 25             With respect to the other 39 or so tickets that

11:17:06 1    Echelon contends exist out there and that we're somehow

11:17:08 2    shielding from production, we looked at further chains in

11:17:13 3    that email.  It revealed that those 39 tickets did not

11:17:16 4    actually result from consumer confusion.  I can't tell you

11:17:21 5    how many.

11:17:21 6              THE COURT:  So, Ms. Saba, did you produce the 39

11:17:26 7    emails?

11:17:27 8              MS. SABA:  We can't -- the way that the Zendesk

11:17:31 9    worked is we ran the search terms.  Like I said, we produced

11:17:34 10   the documents that hit on the search terms.  The email with

11:17:36 11   the 39 missing complaints does not identify the names or

11:17:40 12   addresses of what those complaints are.

11:17:42 13             The only email that we have that's later in the

11:17:45 14   chain says that a sample of 12 of those, we don't know the

11:17:49 15   sample of the 12 of those.

11:17:50 16             THE COURT:  Twelve of the 39?

11:17:52 17             MS. SABA:  Twelve of the 45 tickets --

11:17:54 18             THE COURT:  Okay.

11:17:55 19             MS. SABA:  -- Peloton hits on.  We don't know

11:17:57 20   the universe of those 45 tickets.  The only way for us to

11:18:00 21   try to identify those was by search terms, which we've used

11:18:04 22   in good faith, and also asked Echelon's counsel to send us

11:18:07 23   proposed search terms for that small period of time.

11:18:10 24             THE COURT:  So, what you're telling me, in so

11:18:13 25   many words, is you've tried to run down the 45.  You've got

11:18:22  1    some additional emails that characterize some of the 45 as

11:18:28  2    not based on a sample of 12 as not actually being relevant.

11:18:33  3    And you've run out of ideas as to how to actually find the

11:18:42  4    rest of the specific tickets that --

11:18:48  5              MS. SABA:  That's correct.  And I mean, if they

11:18:50  6    exist.  But I would also note that Echelon already has

11:18:55  7    hundreds of documents bearing on this issue, and we don't

11:18:57  8    see the tangential relevance of locating these tickets as

11:19:01  9    justifying the extreme burden that we would face from

11:19:05 10    manually searching through tens of thousands of records to

11:19:08 11    find documents that we don't even know are actually relevant

11:19:10 12    to Echelon's claim in this case.

11:19:13 13              THE COURT:  All right.  Who's on this issue for

11:19:22 14    Peloton or for Echelon?

11:19:26 15              MR. JAY:  David Jay, Your Honor.

11:19:28 16              THE COURT:  Yes.

11:19:28 17              MR. JAY:  So, just first what I'm hearing from

11:19:35 18    Ms. Saba is that they have no idea what the 45 tickets are

11:19:38 19    and whether they were relevant or not.  So, I don't quite

11:19:40 20    understand.

11:19:40 21              THE COURT:  Well, it sounded to me like they

11:19:42 22    looked at 12 of them and decided most of them of the 12 were

11:19:46 23    not.

11:19:47 24              MR. JAY:  Well, they looked at 12.  I'm not sure

11:19:50 25    how they found the 12, but okay.  That's a fair assessment,

11:19:53  1   Your Honor.

11:19:53  2          But the reality here is let's go back to basics.

11:19:56  3   This was a complete swing and a miss by Peloton in terms of

11:20:01  4   trying to run searches to locate the pertinent documents.

11:20:07  5   You know, had we not had this email in the production, we

11:20:11  6   would not have known that 90 percent or so of the tickets

11:20:16  7   for this two-week period alone, forget about the period,

11:20:21  8   let's say, the five-month period from when they changed

11:20:25  9   their advertising to hide the subscription fee until the

11:20:29  10  point where we filed the claim.  It's about four-and-a-half

11:20:32  11  months or four months and three weeks.  We have no idea how

11:20:38  12  many are missing, but it's not 49.

11:20:40  13         And the pertinence or relevance of this, Judge,

11:20:42  14  is that thousands of bikes were probably purchased based on

11:20:47  15  the misleading representation about the pricing.  So, I

11:20:50  16  don't think relevance is really disputed here.

11:20:55  17         What Peloton is essentially doing here, they've

11:21:02  18  had 18 months to look for this stuff, and they're hiding

11:21:05  19  behind a bad eDiscovery search.  They've provided us now,

11:21:10  20  you know -- you know in connection with this motion what

11:21:12  21  that search was, I don't know if Your Honor wants to get

11:21:15  22  into it here, but --

11:21:16  23         THE COURT:  Well, it's not going to help me any,

11:21:19  24  you know, because basically I'm leaning to they've made a

11:21:25  25  respectable effort to look for a needle in the haystack, and

11:21:28 1    so I'm not inclined to order any more, unless you have some

11:21:32 2    brilliant suggestion.

11:21:34 3           MR. JAY:  Well, Judge, I'll say this.  I don't

11:21:36 4    know if it's a brilliant suggestion.  But as I said, they

11:21:39 5    didn't share their search with us until just now.  We have

11:21:41 6    provided them with the search that we ran on Echelon's

11:21:45 7    Zendesk records.  We work off the same system.  All we want

11:21:48 8    them to do is run the identical search and see what the hit

11:21:51 9    count is.  And they haven't provided that.

11:21:53 10          I can assure you it will be more than four

11:21:55 11   records, Judge, and I don't think it's going to be millions.

11:21:59 12          THE COURT:  So, here's the thing:  So let me

11:22:02 13   just suggest, Ms. Saba, and you tell me if this is

11:22:04 14   reasonable or not.  What if I said for the two weeks in

11:22:13 15   question, run their search terms.  How many hits do you

11:22:17 16   think you would get?

11:22:18 17          MS. SABA:  So, this whole idea of Echelon

11:22:21 18   sharing its search terms with us at 10:00 a.m. this morning

11:22:24 19   before this hearing, they emailed us and suggested that we

11:22:28 20   run over an unlimited period of time the terms $49, open

11:22:32 21   subscription, before that, and two other terms that I --

11:22:35 22   unless I'm wrong, the parties both agreed that we weren't

11:22:38 23   going to engage in search term negotiations with Zendesk

11:22:41 24   records.

11:22:42 25          We shared our search terms with Echelon on

11:22:44 1   December back in -- I'm misrepresenting the date, but in

11:22:48 2   a -- over two weeks ago.  And we just received this

11:22:51 3   suggestion at 10:00 a.m. today.  If Your Honor --

11:22:55 4           THE COURT:  All right.  Thank you, Ms. Saba.

11:22:57 5           So, based on what I've heard, I'm going to deny

11:23:09 6   Echelon's request to do anything further in regards to the

11:23:16 7   Zendesk customer search records.  I do think it's

11:23:19 8   essentially looking for needles in the haystack.  And that

11:23:25 9   for the two weeks in question, Peloton has made a good-faith

11:23:30 10  effort to try to locate Zendesk tickets.  And that for this

11:23:37 11  particular item, it's not proportional to its value to the

11:23:42 12  case.  So, I'm going to deny that request.

11:23:48 13          All right.  Let's move on to Peloton's requests

11:23:53 14  of Echelon.

11:23:59 15          All right.  So, the first thing is the U.K.

11:24:02 16  litigation, all documents, and I thought about that, and I

11:24:10 17  don't understand why documents that, for the most part, are

11:24:20 18  probably not responsive to any actual requests for

11:24:24 19  production that relates to the U.S. case, why it should be

11:24:29 20  ordered produced.  And so, Peloton's motion to compel all of

11:24:36 21  the documents in the U.K. litigation, I'm going to deny

11:24:40 22  that.

11:24:40 23          All right.  So, then we have the advertisements.

11:24:46 24  And so, as I understand it, Peloton has come across various

11:25:01 25  Echelon advertisements which it thinks shows the same sort

11:25:07  1   of conduct that it is accused of in terms of, I believe,

11:25:11  2   false advertising or something like that.  And I thought I

11:25:18  3   noticed in looking through, I think it was -- I don't think

11:25:22  4   it's actually in the letters, but I was reading some of the

11:25:25  5   underlying letters between the parties, and so I don't think

11:25:31  6   there is any value to doing email searches for

11:25:36  7   advertisements.  But I do think that, and I guess I would

11:25:43  8   ask whoever is on this for Echelon, one of the requests in

11:25:49  9   the letter was, and I'm paraphrasing here, all hardcopy

11:25:55 10   mailers and radio scripts for ads during some undefined

11:25:59 11   period of time.

11:26:00 12           And it struck me that I didn't think it would be

11:26:04 13   very hard to produce those.  What do you say about that,

11:26:15 14   Echelon?

11:26:16 15           MR. SCHLADWEILER:  Well, Your Honor, a couple of

11:26:17 16   things.  If you look at their Proposed Order and what

11:26:20 17   they're actually requesting, they're actually requesting all

11:26:25 18   ads where Echelon advertises a subscription separately from

11:26:30 19   the bike.  We've told them repeatedly that there are no such

11:26:32 20   ads.  All of our advertised prices, like if it's $46 a

11:26:38 21   month, for instance, that includes --

11:26:40 22           THE COURT:  So, Mr. Schladweiler --

11:26:41 23           MR. SCHLADWEILER:  Yeah.

11:26:41 24           THE COURT:  So, I do have their Order and I --

11:26:46 25           MR. SCHLADWEILER:  Yeah.

11:26:46  1           THE COURT:  Their Proposed Order.  And so if the

11:26:49  2   answer is there are no such things, then this is pretty

11:26:52  3   easy.

11:26:53  4           MR. SCHLADWEILER:  There are no such things,

11:26:54  5   Your Honor.

11:26:54  6           THE COURT:  All right.  Well, I'm going to order

11:26:56  7   you to put that in writing.  What is the relevant date that

11:26:59  8   I should put as to what time period we're talking about?

11:27:03  9           MR. SCHLADWEILER:  It would be, presumably

11:27:08 10   since, I mean, we only existed starting in 2018, so I don't

11:27:17 11   know if there's a date restriction on this, you know.

11:27:23 12           Well, let me think about that.  If it's unclean

11:27:26 13   hands as to our false advertising claims against them,

11:27:29 14   right, so this is sort of a defense to our claims against

11:27:32 15   them, it relates to when they dropped their price, and they

11:27:36 16   have this $58 a month.  That's when we started.  I believe

11:27:41 17   that was in late 2019 and probably until some time the end

11:27:51 18   of 2020.  I'd have to look at the dates to figure it out

11:27:54 19   exactly, because it's the defense --

11:27:54 20           THE COURT:  Well, so --

11:27:57 21           MR. SCHLADWEILER:  -- that depends on, you know,

11:27:58 22   our claims against them.

11:27:59 23           THE COURT:  So, you think the relevant time

11:28:01 24   period is essentially 2019 to 2021?

11:28:04 25           MR. SCHLADWEILER:  Some time around there.

11:28:07  1          THE COURT:  Ms. Saba, do you have anything to

11:28:10  2  add on that?

11:28:11  3          MS. SABA:  I do.  I mean, Echelon's made this

11:28:13  4  argument that they're not doing the same thing we are.  And

11:28:16  5  in my -- I believe that's a issue for the factfinder to

11:28:20  6  resolve.  Echelon's position is that it doesn't have to

11:28:23  7  produce any because it doesn't think that it's conducting

11:28:26  8  the same type of advertising as Peloton is.

11:28:28  9          We wholeheartedly disagree.  We've attached

11:28:31 10  sample advertisements of the pricing that we're talking

11:28:34 11  about.  So, I just want to clarify that Mr. Schladweiler is

11:28:36 12  not going to say they're not producing anything because

11:28:39 13  their position is the ads aren't doing the same things that

11:28:42 14  ours are.  Our position is that --

11:28:43 15          THE COURT:  Well, doing the same thing as, and

11:28:45 16  maybe this is because we are kind of colloquially here.

11:28:50 17          MS. SABA:  It's --

11:28:50 18          THE COURT:  You know, I think the request for

11:28:53 19  production probably put it a little bit differently.  Are we

11:28:57 20  talking about the right time period, 2019 to 2021?

11:29:02 21          MS. SABA:  I would have to go back and look at

11:29:04 22  exactly the time periods.  I'm happy to confer with

11:29:07 23  Mr. Schladweiler with the understanding that it will be

11:29:09 24  seen.

11:29:09 25          THE COURT:  I'm going to put in the order 2019

11:29:12  1   to 2021, but that's without prejudice to you all coming up

11:29:19  2   with some better time frame.

11:29:23  3           MS. SABA:  Yeah.

11:29:23  4           THE COURT:  And so, I am going to order them to

11:29:26  5   produce the hardcopy mailers and the radio scripts for ads

11:29:34  6   during this time period.  But that's not to say just produce

11:29:41  7   all the hardcopy mailers and radio scripts for ads

11:29:44  8   regardless of what they say.  They need to be tailored to

11:29:47  9   what these requests for production request.

11:29:51 10           All right.  So, then the last discovery issue

11:29:56 11   has to do with the GT+ Connect Bike and Echelon logo.

11:30:02 12           And hold on just a moment.  And so, I guess what

11:30:16 13   I don't understand here, Ms. Saba, is you have this GT+

11:30:30 14   Connect Bike which does not infringe Peloton's trade dress

11:30:34 15   rights, so presumably this shows the existence of an

11:30:39 16   alternative design?

11:30:40 17           MS. SABA:  Correct.

11:30:41 18           THE COURT:  So, why do we need to have any more

11:30:45 19   further discovery?  You've got it front and center.

11:30:52 20           MS. SABA:  Right.  So, I think that this, like

11:30:53 21   you noted, is evidence of our functionality of -- rather,

11:30:57 22   Echelon's functionality affirmative defense, which its

11:31:00 23   affirmative defense reads, "Peloton's trade dress is

11:31:04 24   functional."

11:31:04 25           And I think not only that, but it can relate to

11:31:07  1   the willfulness element.  And I know Echelon will argue, you

11:31:13  2   know, that that's barred by 407.  Respectfully, we think the

11:31:16  3   standard for discovery is very broad.  And we've also cited

11:31:19  4   a case, GlaxoSmith, which on a case dealing with unfair

11:31:23  5   business practices, it says that post-event changes to

11:31:28  6   advertising and brochures is actually relevant and is not

11:31:32  7   barred by 407.  Regardless of whether that's the case, I

11:31:35  8   think that's a fight for another day.

11:31:37  9             So, I think these documents --

11:31:38 10             THE COURT:  Well, so, I'm sorry.  I shouldn't

11:31:42 11   interrupt because I think you were just getting to your

11:31:45 12   point, but I was wondering what it was.

11:31:47 13             MS. SABA:  Sorry.  With respect, now I'm a

11:31:51 14   little lost.

11:31:51 15             THE COURT:  Sorry, Ms. Saba.  Yeah, so the

11:31:58 16   question of admissibility, or, you know, Rule 407, question

11:32:04 17   for another day.  Yeah, that sounds -- you're right.  I

11:32:09 18   don't think that has anything to do with discovery.

11:32:10 19             So, what is the point?

11:32:12 20             MS. SABA:  Oh, okay.  Then maybe we were missing

11:32:15 21   each other.  So, I think I understood your question as why

11:32:17 22   is this discovery relevant if you have the ads already.  You

11:32:22 23   can look at the ads.

11:32:23 24             THE COURT:  Not the ad, the bike.

11:32:25 25             MS. SABA:  The bike.  Yes, we can look at the

11:32:26 1    bike and the ad.  Our requests are broader than that.  And

11:32:29 2    we --

11:32:30 3              THE COURT:  Well, so I understand they're

11:32:31 4    broader, but I'm wondering if you have the bike, what more

11:32:36 5    do you need?

11:32:38 6              MS. SABA:  So, on the functionality -- or

11:32:40 7    there's two reasons why we think these are relevant.

11:32:43 8    Functionality and the willfulness and design-around for

11:32:46 9    trade dress.  And we think that if we -- some of our

11:32:4910    requests deal with the reasons behind that change, the

11:32:5211    marketing of that change.

11:32:5412              And then, that not only goes to functionality,

11:32:5613    but also it goes to the willfulness of infringement and

11:32:5914    misappropriation.  So, that's where the 407 argument comes

11:33:0415    in, and we think we're entitled to that under the broad

11:33:0716    standard of discovery.

11:33:0817              So, it's not only functionality.  It's also this

11:33:1018    other element is what I guess I'm trying to get at.

11:33:1319              THE COURT:  All right.  Who's arguing this for

11:33:1920    Echelon?

11:33:2121              MR. RYERSON:  Your Honor, this is Jamie Ryerson

11:33:2322    for Echelon.  First, with respect to functionality, you hit

11:33:3023    the nail on the head.  There's evidence of alternate designs

11:33:3424    and in spades.  Not only are the GT Bikes themselves

11:33:3925    evidence of alternate designs, but we submitted as an

11:33:42  1    exhibit to our letter to the Court about two dozen different

11:33:46  2    designs offered by Echelon and other competitors that are in

11:33:50  3    the marketplace.

11:33:51  4           So, there's no need to seek discovery on

11:33:55  5    hypothetical designs that Echelon considered, but did not

11:33:59  6    launch to try -- for proof that alternate designs exist.

11:34:07  7    Echelon doesn't --

11:34:07  8           THE COURT:  So --

11:34:09  9           MR. RYERSON:  Go ahead.

11:34:10 10           THE COURT:  So, yeah.  So, the alternative

11:34:12 11    designs exist.  I'm pretty confident that that doesn't

11:34:21 12    really need any more discovery.

11:34:22 13           What about what I understand to be Ms. Saba's

11:34:26 14    argument about willfulness?

11:34:29 15           MR. RYERSON:  Well, Your Honor, they didn't

11:34:33 16    argue willfulness in the letter to Your Honor as the basis

11:34:37 17    for relevance.  The basis for relevance in the letter to

11:34:40 18    Your Honor was strictly that trade dress was relevant to the

11:34:47 19    functionality defense.  Willfulness is where this all

11:34:50 20    started.

11:34:51 21           And at the time, we argued and I had case law at

11:34:56 22    the -- if we had briefed this -- if that's what they wanted

11:35:00 23    to brief, I would have cited the case law that says you

11:35:04 24    can't offer evidence of a design change to show culpability

11:35:08 25    with respect to the prior design.  They want to argue that,

11:35:12  1    well, Echelon stopped selling one infringing product and

11:35:16  2    started selling a non-infringing product.  And they must

11:35:19  3    have done it because they knew that the old product was

11:35:22  4    infringing.

11:35:22  5             I don't have the law, unfortunately, with me at

11:35:26  6    my fingertips right now.  I wasn't anticipating Peloton's --

11:35:31  7             THE COURT:  Okay.  I understand.  And maybe

11:35:32  8    that's the reason why -- maybe that's the reason why I asked

11:35:38  9    you about it was because maybe I hadn't seen willfulness in

11:35:44 10    the letter, either.  Let me just think about this for a

11:35:47 11    second.

11:35:52 12             So, presumably there's other discovery,

11:36:02 13    including of the custodians, that was more directly going

11:36:09 14    towards willfulness; right?

11:36:14 15             MR. RYERSON:  Yes, Your Honor.

11:36:15 16             MS. SABA:  Not with respect --

11:36:16 17             THE COURT:  Mr. Ryerson.

11:36:20 18             MR. RYERSON:  Well, the GT+ Bike is a newer

11:36:24 19    design that was launched.

11:36:25 20             THE COURT:  No, no.  Sorry.

11:36:26 21             So, it's not so much about the GT+ Bike, but in

11:36:32 22    terms of the inference which is you knew that you were

11:36:37 23    infringing their trade dress.  Presumably they have done

11:36:42 24    something in discovery to try to figure out whether or not

11:36:46 25    that's the case; right?

11:36:47 1          MR. RYERSON:  Absolutely, Your Honor.  There

11:36:49 2   were a number of requests concerning the design process when

11:36:53 3   these bikes were initially launched in 2018, and there were

11:36:58 4   a number of different models that were launched over time.

11:37:01 5   And we've provided thousands of pages of discovery

11:37:05 6   concerning the design process and what was considered, and

11:37:09 7   all of that would go to the willfulness or the lack thereof.

11:37:13 8          THE COURT:  All right.  Ms. Saba.

11:37:14 9          MS. SABA:  I agree that we have requests

11:37:18 10  outstanding and no doubt that Mr. Ryerson and Echelon have

11:37:21 11  produced documents related to the decisionmaking of the

11:37:24 12  original logo.  We think in that logo, and trade dress, and

11:37:29 13  in those documents, we've put them forth at prior discovery

11:37:34 14  conferences.  There's tons of evidence in there that does

11:37:37 15  indicate that Echelon was looking at Peloton's bikes.  We

11:37:41 16  think that these requests go squarely to proving that

11:37:45 17  element as well.

11:37:46 18          We're, you know, willing to work with Echelon on

11:37:50 19  tailoring some of these requests to get at what we're

11:37:52 20  looking for here, but at this point we've just gotten a

11:37:55 21  blanket refusal on their end to produce anything other than

11:37:58 22  financial documents related to the GT+.

11:38:00 23          So, yes, I agree with you.  There are requests

11:38:03 24  outstanding that dealt with older versions of this bike, but

11:38:07 25  none that get to this issue.

11:38:08 1             THE COURT:  All right.  Well, so I take it the

11:38:13 2     question of redesign, and I'm not asking anybody to waive

11:38:20 3     any privileges here, Echelon, is this the kind of thing that

11:38:27 4     there was legal involvement in?

11:38:32 5             MR. RYERSON:  Certainly, yes.  We've been

11:38:36 6     advising Echelon on --

11:38:38 7             THE COURT:  All right.  All right.

11:38:40 8             MR. RYERSON:  -- design.

11:38:41 9             THE COURT:  Okay.  That's okay.

11:38:42 10            So, look, here's the thing.  I think it's not

11:38:45 11    proportional because it's going to be so over latent with

11:38:48 12    claims of privilege that it's way beyond.  And it's pretty

11:38:57 13    tangential to actually the willfulness issue at best.  Not

11:39:01 14    to mention this, it's really not the issue that's raised in

11:39:04 15    the letter.  So, I'm going to deny the request for further

11:39:13 16    discovery relating to the GT+ Connect Bike.

11:39:19 17            All right.  So, in terms of the things that I

11:39:23 18    have ordered, the Proposed Order says Defendant, that's you,

11:39:30 19    Echelon, shall complete the production of the foregoing

11:39:32 20    documents by February 7th, 2022.

11:39:40 21            It strikes me that since the documents are

11:39:42 22    mostly related to the hardcopy mailers and radio scripts

11:39:46 23    that you're probably going to say you don't even have any

11:39:48 24    of, that's a date you can meet?

11:39:52 25            MR. SCHLADWEILER:  I think that's a date we can

11:39:54  1   meet, Your Honor.  Yes.

11:39:55  2            THE COURT:  So, actually, okay.  So, that's

11:39:58  3   good.  That will be the date for you.  Let me just go back.

11:40:03  4            MR. SCHLADWEILER:  Just to be clear, the Order

11:40:05  5   will be not just any mailers.  It will be the mailers

11:40:09  6   specifically about, you know, what their -- the language in

11:40:15  7   their Proposed Order, in other words.

11:40:17  8            THE COURT:  Well, the language in the Proposed

11:40:19  9   Order didn't actually mention the mailers and the radio

11:40:21 10   scripts.  I'll add that in.

11:40:25 11            MR. SCHLADWEILER:  Right.  Right.

11:40:26 12            THE COURT:  So, I'm curious.  It seems very old

11:40:35 13   fashioned for what's essentially an eCompany.  How many

11:40:41 14   mailers do you all use?  Do you have any idea?

11:40:46 15            MR. SCHLADWEILER:  I don't have any idea.  I

11:40:49 16   wouldn't expect it would be that many.  And I definitely

11:40:52 17   wouldn't -- this is the question.  Why I was asking this is

11:40:54 18   because their Proposed Order said, you know, it's the

11:40:57 19   advertisements where we sell our price of our bike

11:41:01 20   separately from our price of our subscription.  And the

11:41:03 21   answer is zero.

11:41:04 22            If the answer is how many mailers generally do

11:41:06 23   we have, I still wouldn't expect that number to be large.  I

11:41:11 24   just don't know, sitting here, what that is.

11:41:14 25            THE COURT:  What about radio ads?

11:41:22  1          MR. SCHLADWEILER:  We certainly have a few radio

11:41:24  2   ads or have had a few radio ads.  Again, it's the same

11:41:27  3   scenario where, you know, we've never advertised those

11:41:30  4   prices separately.  And so, there's zero of those.

11:41:35  5          But as far as just general radio ads, I know of

11:41:39  6   a couple, and they're -- I just -- I don't think it's

11:41:42  7   extensive, but I don't know.

11:41:44  8          THE COURT:  How hard is it to actually get the

11:41:47  9   scripts of radio ads in hardcopy and hardcopy mailers over a

11:41:53 10   three-year time period?

11:41:55 11          MR. SCHLADWEILER:  It's going to be pretty hard.

11:41:56 12   If we had to get everything, like I say, if it's -- it

11:42:00 13   depends on what the Order says.  If the Order just says, you

11:42:03 14   know, give us the stuff where we advertise those prices

11:42:08 15   separately, there's nothing.  But if it's just all of our

11:42:10 16   mailers, that is a big task because, for instance, we've had

11:42:15 17   some turnover in our company.  Some of the people that had

11:42:19 18   this, sort of this graphics folder that we had a lot of this

11:42:22 19   information in, and it was maintained by our previous

11:42:26 20   graphics people, they no longer work here.

11:42:28 21          So, it's a little bit hard for us to find.  Some

11:42:30 22   older stuff, we've been finding just generally.  And it's

11:42:33 23   not really easy to search.  And so, therefore, it is a big

11:42:37 24   task for us.  And they've gotten all the mailers and all the

11:42:40 25   other information that is actually relevant to their

11:42:43  1    claims --

11:42:43  2                THE COURT:  Well --

11:42:44  3                MR. SCHLADWEILER:  They're just talking about

11:42:47  4    stuff --

11:42:47  5                THE COURT:  So, Mr. Schladweiler --

11:42:49  6                MR. SCHLADWEILER:  Yes.

11:42:50  7                THE COURT:  -- I presume to respond to this you

11:42:51  8    have to basically look at all the mailers and the radio

11:42:57  9    scripts.  So, I would ask that when you have done that and

11:43:05 10    you produce your response that you also tell Peloton how

11:43:17 11    many different hardcopy mailers there are over whatever the

11:43:22 12    time period is and how many radio scripts for ads, you know,

11:43:28 13    different ones there are.

11:43:30 14                All right?

11:43:32 15                MR. SCHLADWEILER:  That's fair, Your Honor.

11:43:33 16                MS. SABA:  Respectfully, Your Honor, if I could

11:43:34 17    get verification on that Order, so I'm understanding.  And I

11:43:38 18    just want to make sure that Mr. Schladweiler is saying, so

11:43:44 19    that there's going to be no documents that exist because

11:43:47 20    Echelon doesn't do this.  We've provided specific examples

11:43:50 21    in our briefing of what we're talking about here and what --

11:43:53 22                THE COURT:  Well, so, Ms. Saba, it doesn't

11:43:56 23    really matter what you say in your briefing.  It's whatever

11:43:59 24    the request is that you have outstanding and, you know --

11:44:09 25                MS. SABA:  I think -- oh, sorry.

11:44:10  1          THE COURT:  -- part of what you can negotiate

11:44:13  2    with Mr. Schladweiler is if you need to slightly reformulate

11:44:16  3    it in the next 24 hours, you should discuss that with him.

11:44:21  4    But, you know, I'm not going to order produce all documents

11:44:27  5    that look like documents that Peloton cited in its briefing

11:44:30  6    to me.

11:44:31  7          Okay?

11:44:31  8          MS. SABA:  Of course.  I wasn't -- yeah.  I

11:44:33  9    wasn't suggesting that, and I'm happy to confer with

11:44:36 10    Mr. Schladweiler.  I just think that our -- I think we have

11:44:38 11    a different view of what our requests covered.

11:44:40 12          THE COURT:  Well, try to work that out.  Okay?

11:44:43 13    So, hold on a second.

11:44:59 14          All right.  And so, the things that I ordered

11:45:00 15    you to produce, Ms. Saba, which I think the thing that you

11:45:08 16    say still needs to be done is the outside counsel

11:45:12 17    communications with Flywheel.  When can you complete that?

11:45:23 18          MS. SABA:  To be honest, that's -- I think it

11:45:26 19    depends.  That's a pretty burdensome task.  We're not

11:45:30 20    involved with that firm, so we have to coordinate with them

11:45:33 21    somehow, figure out who was involved, collect those emails.

11:45:36 22          I'm not sure if Mr. Schladweiler's envisioning a

11:45:40 23    log.  I would prefer not to do a log on that given the

11:45:43 24    number of privileged documents that are going to be in

11:45:45 25    there.

11:45:45 1          THE COURT:  Well, so that's the reason why I'm

11:45:48 2     sort of -- I think that the Order says it's between counsel

11:46:01 3     on one side and counsel on the other side.  So there

11:46:04 4     shouldn't be any privileged documents; right?

11:46:08 5          MS. SABA:  That's -- again, though, I think it

11:46:15 6     depends on how quickly we can get the emails from the firm.

11:46:19 7     We'll work as diligently as possible, but it's hard for me

11:46:21 8     to give a concrete deadline on when.

11:46:24 9          THE COURT:  Well, I'm going to put in

11:46:28 10    February 7th, 2022 as the date to do this by, but I

11:46:33 11    understand that you're not exactly promising you can do it

11:46:38 12    by then.  And I expect that you and Mr. -- I expect Peloton

11:46:42 13    will be diligent in trying to get this done, but if that

11:46:46 14    proves to be over ambitious, you and Mr. Schladweiler will

11:46:50 15    discuss it and be reasonable with each other.

11:46:53 16          Right, Mr. Schladweiler?

11:46:54 17          MR. SCHLADWEILER:  Yes, Your Honor.

11:46:57 18          THE COURT:  All right.  Right, Ms. Saba?

11:47:01 19          MS. SABA:  Right.  That's fine.  I just also

11:47:03 20    want to note we will keep Mr. Schladweiler in the loop with

11:47:06 21    this.  We're not sure of the internal email collections with

11:47:09 22    Houston.  These are all former employees.  We assume they

11:47:11 23    have the emails, but we'll keep you in the loop with what

11:47:14 24    our collection is turning up.

11:47:16 25          THE COURT:  Okay.  All right.

11:47:17  1          So, I will issue two written Orders that you'll

11:47:23  2    recognize that they're based on the Orders you submitted to

11:47:28  3    me, and they should be consistent with what I've said today.

11:47:35  4    But to the extent that there's some inconsistency, the

11:47:40  5    written Order is what's important.

11:47:43  6          So, you also wanted to take up the motion to

11:47:47  7    bifurcate and stay Amended Counterclaims 1 to 7.  And I read

11:47:52  8    the briefing, and essentially the basic answer is I deny the

11:48:02  9    request to bifurcate and stay the Amended Counterclaims,

11:48:12 10    period.

11:48:13 11          In terms of the motion to bifurcate, that's

11:48:15 12    without any prejudice at all as to how various issues might

11:48:20 13    be handled in terms of trial.  And just for a for instance,

11:48:33 14    one of the arguments going back and forth is that the

11:48:37 15    Echelon antitrust claim has a lot of overlap with some of

11:48:41 16    their other counterclaims, and that it doesn't make much

11:48:48 17    sense to try them separately from each other.

11:48:51 18          And it may be the case that basically all of the

11:48:56 19    Echelon counterclaims, other than non-infringement and

11:48:59 20    invalidity, might make sense to bifurcate them and try them

11:49:06 21    with the antitrust claim, but I don't know enough about it

11:49:12 22    right now to do that or to say that that's what's going to

11:49:18 23    happen.

11:49:19 24          But you need to expedite discovery and to the

11:49:24 25    antitrust claims.  And if it turns out to be that you need

11:49:31  1    to extend the fact discovery by up to two weeks, you can

11:49:36  2    discuss that amongst yourselves.  The main thing is whatever

11:49:40  3    the date is for case dispositive motions, you need to keep

11:49:44  4    that date.

11:49:47  5            I am aware that there's a motion to dismiss the

11:49:52  6    antitrust counterclaim when the briefing is finished on

11:49:56  7    that, and it will be a priority to resolve that.  And if you

11:50:02  8    need to put more resources into this, because I do

11:50:06  9    understand antitrust cases are complex and that they do

11:50:12 10    involve, you know, issues that aren't necessarily raised,

11:50:18 11    issues that definitely are not raised in patent cases, but

11:50:24 12    you need to work on that and to try to get it all done.

11:50:28 13            So, I'm going to deny the motion, Docket

11:50:32 14    Item 234.

11:50:37 15            All right.  Is there anything else?  I hear

11:50:43 16    nothing.

11:50:44 17            All right.  Thank you for your time today.  I'm

11:50:47 18    going to issue these Orders, and I will see you all down the

11:50:51 19    road.

11:50:53 20            We'll be in recess.

11:50:55 21            (Court was recessed at 11:50 a.m.)

        22            I hereby certify the foregoing is a true and

        23    accurate transcript from my stenographic notes in the

        24    proceeding.    /s/ Heather M. Triozzi
                              Certified Merit and Real-Time Reporter
        25                    U.S. District Court.